Argued and submitted March 14, affirmed May 9, 2007

In the Matter of
C. N.-J. J., aka C. N.-J., a Minor Child.

STATE ex rel DEPARTMENT OF
HUMAN SERVICES,
*Respondent,*

*v.*

L. C. J.,
*Appellant.*

Polk County Circuit Court
7596J; A133674

159 P3d 324

Inge D. Wells argued the cause for appellant. With her on the brief was Wells & Wells.

Judy C. Lucas, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Brewer, Chief Judge, and Ortega, Judge.

ORTEGA, J.

## ORTEGA, J.

■      Mother appeals from a judgment terminating her parental rights to her daughter. We review *de novo*, giving weight to the juvenile court's credibility findings. ORS 419A.200(6); *State ex rel Juv. Dept. v. Proctor*, 167 Or App 18, 27, 2 P3d 405, *adh'd to on recons*, 169 Or App 606, 10 P3d 332 (2000). The trial court found mother unfit on several grounds; we focus on mother's pattern of relationships with sex offenders and affirm termination of her parental rights.

Child was born in February 2005. She was removed from mother's care about four and one-half months later, after the Department of Human Services (DHS) received information that the home was unsanitary and that an untreated sex offender, J. L., was staying in the home. J. L., who was about 25 years old at the time, had had a juvenile adjudication for a sex offense. One of the stipulated exhibits in the record contains a police report that J. L.'s probation officer faxed to DHS; the report details the accusation that J. L., when he was nearly 14 years old, engaged in an act of oral sex with a girl who was four or five years old.[1]

J. L. has a lifetime obligation to register as a sex offender. At the time of child's removal, he also was on post-prison supervision for a third-degree assault conviction[2] and was required to complete sex-offender treatment as a condition of his parole, but had not done so. According to Miller, the DHS protective service worker who removed child, mother claimed that J. L. was not a risk to child, because his offense occurred when he was a juvenile. At trial, mother admitted that she allowed J. L. to be around child even after J. L.'s probation officer informed her that J. L. was not allowed to be around children.

After child was removed, mother regularly participated in visitation and did well during visits. She was not allowed unsupervised visits, however, because of concerns

---

[1] Although the report is part of the record, counsel for DHS inexplicably did not mention it either in DHS's brief or in oral argument.

[2] His post-prison supervision ended in May 2006, about three months before trial.

that she would allow sex offenders to have contact with child and would make good on threats to take child to another state.

Shields, child's DHS caseworker, referred mother for various court-ordered services—a psychological evaluation, parenting classes, parent mentor services, and family sex abuse treatment (FSAT)—and mother agreed to participate. Dr. Sweet, the psychologist who evaluated mother, testified that mother has a dependent personality disorder, which would contribute to inappropriate relationship choices and an inability to feel comfortable functioning independently. Treatment is extremely difficult and could take years, even with a motivated client, and mother so far has not successfully engaged with services that were provided to her.

Mother had minimal success in services. She graduated from a 13-week parenting class, but the parenting trainer believed that she had not learned to keep child safe. Mother began mentor services but was unwilling to apply the information that she was taught and eventually stopped attending, resulting in a failure to successfully complete that program. Mother was twice referred to the FSAT program, which is designed to educate nonoffending parents on how to protect children from abuse. She participated erratically and failed to successfully complete the program either time.

Despite the FSAT classes, mother continued in relationships with sex offenders and failed to display insight into protecting child. Mother developed a friendship and briefly lived with a woman who reportedly had sexually abused children; although mother claimed she had ended that friendship, mother's parenting trainer believed that mother had an on-and-off friendship with the woman. Mother's relationship with J. L. ended, but she then became involved with and engaged to Mortimer, who had convictions for third-degree rape involving three 15-year-old victims during 2001 and 2002 and who was convicted in 2005 of failure to report as a sex offender. One of the conditions of Mortimer's post-prison supervision was that he have no contact with minors. Mother acknowledged that she continued to date Mortimer for a period after she learned that he was an untreated sex offender, although their relationship ended some three

months before trial. At the time of trial, mother was living with J. L.'s aunt; mother testified that she and J. L. had reconciled and had become engaged one and one-half months before trial. J. L. apparently still had not completed sex offender treatment.

Mother was hostile and highly resistant to suggestions that she should avoid relationships with sex offenders. When Weisensee, a mental health therapist with the FSAT program, talked to mother about safety issues, mother "would go on about how she was taught not to judge people and we were judging this person, and [we] just couldn't seem to make any headway with her." Shields similarly testified that mother did not recognize any safety risk to child. Mother testified that her plan to keep child safe was simply never to leave J. L. alone with child.

Weisensee testified that it was extremely rare for a sex offender to have only one victim and identified the trauma that a toddler would experience as a result of abuse. She further testified that mother's failure to refrain from relationships with sex offenders put child at risk of being molested. In Weisensee's assessment, mother had not demonstrated the willingness or ability to keep child safe from abuse.

Trial occurred in August 2006, about 14 months after child was removed from mother's care. At the time of trial, child was living with a family that was an adoptive resource. Although the testimony about the placement was minimal, the responsible caseworker testified that child was "in a very good placement, and she will be well taken care of and loved." Sweet testified that forming lasting attachments during the first two years of life is very important and that a child who fails to form attachments is at greater risk for emotional and behavioral problems.

The juvenile court found, among other things, that mother lacks "the skills necessary to keep the child safe from unsafe people, as exhibited by her continued involvement with sex offenders" and that mother's conduct is seriously detrimental to child because "it presents a severe threat to the child's safety and prevents the child from returning to [m]other's home, prolonging the child's instability." The court

also found that child needs permanency and stability that mother cannot provide. As to the credibility of the witnesses, the court found mother's testimony to be "illogical, evasive, unbelievable and incredible." DHS's witnesses were found to be credible.

On appeal, mother argues that, given the lack of evidence that J. L. had offended as an adult or that he had abused child, DHS failed to establish that J. L. posed a risk of harm to child. DHS responds that J. L. does present a risk to minor children and that mother will not keep child safe. As we explain below, we agree with DHS.

ORS 419B.504 provides, in part:

"The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child or ward and integration of the child or ward into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:

"* * * * *

"(5) Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make it possible for the child or ward to safely return home within a reasonable time or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."

The statute requires a two-step analysis. First, the court must determine if the parent is unfit by examining whether the parent has engaged in conduct or is characterized by a condition and whether the conduct or condition is seriously detrimental to the child. Second, if the parent is unfit, the court must determine whether it is improbable that the child will, within a reasonable time, be integrated into the parent's home. *State ex rel Dept. of Human Services v. Smith*, 338 Or 58, 80-81, 106 P3d 627 (2005); *State ex rel SOSCF v. Stillman*, 333 Or 135, 145-46, 36 P3d 490 (2001). Facts supporting termination must be proved by clear and convincing

evidence, that is, evidence that makes the existence of the asserted facts highly probable. ORS 419B.521(1); *State ex rel Dept. of Human Services v. Radiske*, 208 Or App 25, 48, 144 P3d 943 (2006).

Here, the relevant conduct is mother's persistent involvement in relationships with untreated sex offenders, particularly J. L. That conduct undisputedly continued through the time of trial, when mother was engaged to J. L. We find that mother's conduct is seriously detrimental to child because it creates a significant risk that child will be the victim of abuse. The record shows that J. L. previously was adjudicated and was required to register as a sex offender, that he apparently did not complete treatment, that sex offenders typically have multiple victims, that mother's involvement with sex offenders created a risk to child, and that mother persisted in close relationships with J. L. and other sex offenders despite warnings about the danger to child. Although the record does not contain specific evidence about the risk to child posed by mother's other relationships, mother's relationship with J. L. is enough to establish a significant danger to child's welfare, because J. L. has previously been adjudicated of a sex offense and was at least accused of victimizing a girl close to child's age; according to Weisensee's testimony (which the juvenile court found credible), he would be likely to reoffend. Under the circumstances, we can infer that it is highly probable that child will be at serious risk of abuse if she is returned to mother's care.

■ Despite repeated interventions, mother has refused to adjust her conduct. Given that refusal and her persistence in engaging in relationships with untreated sex offenders, we find that it is improbable that child can safely be returned to mother within a reasonable time.

■ Finally, we conclude that it is in child's best interests to be freed for adoption. ORS 419B.500. Child needs a safe, permanent home; mother's home is not available for her, and an appropriate adoptive resource is.

Affirmed.