Argued and submitted December 1, 2008, affirmed May 20, appellant's petition for reconsideration filed June 3 allowed by opinion August 5, 2009
See 230 Or App 119, 213 P3d 844 (2009)

In the Matter of C. M. W. W.,
a Minor Child.

STATE ex rel DEPARTMENT OF HUMAN SERVICES,
*Appellant,*

*v.*

A. C.,
aka A. L. C.;
and C. M. W. W.,
aka C. M. W. W.,
*Respondents.*

Linn County Circuit Court
J060447; Petition Number 06135JTM;
A139628

209 P3d 328

Inge D. Wells, Senior Assistant Attorney General, argued the cause for appellant. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Nancy Maria Brady argued the cause for respondent A. C.

Shannon Flowers, Deputy Public Defender, argued the cause for respondent C. M. W. W. With her on the brief was Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.

Before Edmonds, Presiding Judge, and Armstrong, Judge, and Wollheim, Judge.

EDMONDS, P. J.

**EDMONDS, P. J.**

The state appeals a judgment dismissing its petition to terminate mother's parental rights to her two-year-old son, who has been in foster care since his birth, on the basis of unfitness under ORS 419B.504. On *de novo* review, we affirm.

The outcome of this case turns on whether the circumstances that the state relies on to prove the statutory elements of ORS 419B.504 as of the date of the hearing in this case (March 17-18, 2008, and May 7, 2008) are established by clear and convincing evidence. ORS 419B.521(1). "Clear and convincing evidence" is evidence that makes a fact in issue "highly probable." *Riley Hill General Contractor, Inc. v. Tandy Corp.*, 303 Or 390, 402, 737 P2d 595 (1987). ORS 419B.504 provides, in part:

> "The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child or ward and integration of the child or ward into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:
>
> "* * * * *
>
> "(5)  Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make it possible for the child or ward to safely return home within a reasonable time or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."

That statute sets out a two-step analysis for a court to apply in determining whether to terminate parental rights. First, a court must consider whether the parent has engaged in conduct or is characterized by a condition and whether the conduct or condition is seriously detrimental to the child. Second, if the parent is unfit, the court must determine whether the "integration of the child into the home of the parent or parents is improbable within a reasonable time due to

conduct or conditions not likely to change." *State ex rel Dept. of Human Services v. Smith*, 338 Or 58, 80-81, 106 P3d 627 (2005); *State ex rel SOSCF v. Stillman*, 333 Or 135, 145-46, 36 P3d 490 (2001).

After hearing the evidence, the trial court concluded that

"[t]his mother is not perfect and still has progress to make before her child can be safely returned to her. However, she has made substantial progress in ameliorating the conditions that caused the previous termination [of her parental rights to another child]. To the extent that she has not yet fully ameliorated those conditions, they do not remain at such a level as to justify termination of parental rights."

(Underlining in original.) The court explained:

"If the sole standard of proof in this case were what is in the best interests of the child, the decision would be clear—termination of parental rights and placement in a permanent adoptive home would be in the child's best interests. However, that is not the standard. The state must prove that the parent is unfit and is not likely to remedy that unfit condition in a reasonable time as well as that adoption is in the child's best interests. In this case, because mother has made substantial progress in the past year and continues to be committed to progress, the court cannot find that she remains unfit and is not capable of remedying her unfitness."

On appeal, the state agrees that, although mother has not used methamphetamine since December 2006 and has made "some progress in dealing with her anger issues," her failure to obtain her GED as required in order for her to graduate from drug court; her recent marriage to a person with an extensive criminal history, including sex offenses involving minors; her failure to participate in an anger management class; and her role in an angry dispute with her husband at the courthouse are all indicators of why there is clear and convincing evidence that she continues to be an unfit parent. There is evidence in the record to support the state's argument as well as countervailing evidence. In what follows, we discuss some of the evidence that we find most probative regarding the issues before us. Essentially, those

issues focus on mother's history of drug addiction and her marriage to her current husband.

When asked if mother currently has the parenting skills "to safely parent [her child]," mother's caseworker testified, "You know, I think she does at times fairly well for her visitation, but when I think about 24/7 for this little guy, I am very concerned about that." When asked about the basis of her concern, the witness replied, "The anger that I still see, the lack of control as far as impulses." But later in her testimony, the caseworker agreed that "up until [mother's new husband] came into the picture," she was "relatively satisfied with [mother's] progress to the point that [she] supported the termination case being continued for a few months."

Mother offered evidence at the hearing of her progress since completing a residential treatment program for drug addiction in February 2007. Included among the witnesses who testified on her behalf was the circuit court judge who had supervised mother's participation in his drug court program since June 2006. The judge testified:

> "[Mother is] like a blossoming flower, I mean she really is. Her attitude changed and she looked at things differently. And as I say, she's been clean now for 491 days, and you know, she's well on her way. She's really made a significant and miraculous change."

In the same vein, mother's drug and alcohol counselor testified that

> "[Mother has] shown significant improvement. When she first started the program, she had a lot of criminal thinking, difficulty accurately reporting regarding her drug use. Initially, had several positive UA's for amphetamine and methamphetamine, difficulty reporting her use, not working to create a clean and sober social network for herself that would support her efforts, not practicing good, prosocial skills in treatment. So she had a bumpy road early on in treatment.

> "She was agreeable to residential [treatment] when we recommended that and she entered the ARC program and successfully completed that. And when she returned to the program following her completion in spring of last year, she demonstrated kind of a higher skill level about her recovery

and what she reorganized for herself in the community to support her efforts. Her thinking started to change, she was more amenable to feedback, both from staff and peers. She performed more appropriately in groups. Her thinking really supported some of the cognitive restructuring as required in recovery. She obtained a sponsor. She demonstrated consistent attendance to community support groups such as AA and NA. Her attendance to treatment was consistent and reliable, she became a group leader and other peers looked to her for guidance, encouragement and direction. And she was a great support for others. She adjusted very well. And I think what really provided that boost for her was the residential care.

"[COUNSEL]: What about the drug court program, did that seem to help [mother]?

"[COUNSELOR]: Absolutely. I think if she were released on her own she would have had to put this together without any structure or guidance. So I think that the drug court program is very intense. And so when she was released from residential care back into that phase 1 intensive structure, that helped her stay the course and she internalized a lot of recovery on her own. So she was no longer doing it because she had to do it. She was making sound decisions, she was seeking out feedback.

"Whenever she had a crisis, early on in treatment she could be fairly reactive and impulsive which would lead to poor decision making and consequences. Later on in treatment she would notice herself being in a reactive state. High level of emotionality, being in a quandary, trying to think it through and use a lot of the tools that she learned. And she would seek me out or other staff members, or she would use her phone list and call people in higher phases. It's just like parents, you want to know what your kids are doing, look at who they're hanging out with. [Mother] was kind of hanging out with the winners, the people that had a real stable recovery and were doing well in treatment. And so she was managing some conflicts and difficulties with better care.

"[COUNSEL]: Was [mother] ever required to—at least from your office—required to do any sort of anger management classes?

"[COUNSELOR]: [Mother] had a prior residential treatment experience in her past, prior to the ARC in 2007,

where she had some significant problems and that was recommended to her at that time. She would sometimes demonstrate some volatility and we would work to de-escalate and help her problem solve. And so that was part of her treatment plan. And so we incorporated some of the issues in her treatment groups as well as individual sessions. And so we did address it that way. To my knowledge [mother] did not complete a formal anger management class, but nor was it recommended from the drug court team."

Mother's probation officer since June 2006 also testified at the hearing that mother had generally been compliant with the conditions of her court-ordered probation and could be off probation as early as April 28, 2007. She was only one test away from obtaining her GED. On April 4, 2007, mother's probation officer wrote:

"On January 17, 2007, [mother] completed a 60 day residential treatment program. It is my understanding that she did very well, in fact I can report that her attitude, participation and desire to work on recovery has improved greatly since returning from residential treatment. She appears to be more honest, sincere and realistic in her desire to change her life. [Mother] is much less guarded and is open to constructive feedback; I am told by her counselor that she is becoming a leader in group."

At the time of trial, mother was voluntarily going to AA or NA meetings three or four times a week.

The trial court also heard the testimony of Dr. Ewell, a licensed psychologist, who examined mother on August 2, 2007. He was asked to address mother's ability to be a fit parent at that time, whether she had any mental health issues that impacted her ability to care for her child, and what type of services would be appropriate, and to assess her ability to be a fit parent within a reasonable period of time. Ewell testified that mother presented a history of methamphetamine dependence, that she demonstrated symptoms consistent with an antisocial and histrionic personality disorder, and that, "[t]o date, the volatility of her emotions, the inconsistent nature of her living arrangements and general lifestyle would have a negative impact on her ability to adequately parent." However, he opined that "[i]t is possible * * * that

[mother's] lifestyle will stabilize in the future if she maintains abstinence from drugs" and that, "[i]f [mother] continues with treatment and remains invested in it, she might be able to parent in the reasonable future." He concluded by suggesting "that a period of four to eight months of additional treatment beyond this point might be necessary."

As indicated by mother's caseworker, the primary concern held by DHS at the time of trial was mother's relationship with her new husband. The state characterizes mother's husband as a sex offender who never has completed treatment and who has a significant history of domestic violence and criminal convictions, including convictions involving consensual sexual contact with underage females. There is evidence in the record that supports the state's concerns. However, once again, there is also countervailing evidence.

Mother met her husband in the summer of 2007, and they were married on December 15, 2007. Mother's husband, age 27 at the time of trial, was released in June 2007 from a state correctional facility after completing a drug and alcohol treatment program. He returned to Linn County and completed an outpatient treatment program in October 2007. On February 26, 2008, mother's husband was evaluated by Dr. Neilson, a licensed psychologist, who had also evaluated him in 1996. Neilson testified that, initially, he had diagnosed mother's husband with an "oppositional defiant disorder," which "continued right into antisocial personality disorder behavior as an adult." However, Neilson explained:

"when I saw him the second time, it was like—if you pardon the expression—he was born again. He was intent upon leading a socially acceptable life and turning everything around. He described himself in the most negative of terms * * *."

The evidence is also in conflict as to whether mother's new husband is presently in need of sex offender treatment. Neilson opined, "There are many risks for [mother's husband] having to do with failure to achieve a different lifestyle. But I doubt that sex offending is one of these big risks." *Cf. State ex rel Dept. of Human Services v. L. C. J.*, 212 Or App 540, 546, 159 P3d 324 (2007) (the court inferred that the mother's relationship with an untreated sex offender made it

highly probable that the child would be at serious risk of abuse if returned to mother's care).

After reviewing the entire record, we agree with the trial court that the state has not carried its burden of proving that it is highly probable that mother's child cannot be returned to her custody within a reasonable time. As Neilson aptly testified, when asked whether good intentions are enough for a person to turn their life around, "the proof is in the behavior." Here, mother and her new husband have demonstrated their intentions to rehabilitate their lives by their behavior, and they have done so for a substantial period of time. Whether they ultimately will be successful depends on their future choices and behavior. Nonetheless, for the reasons discussed above, the trial court did not err on this record in ordering that the case plan for the child be "Return to Parent" with instructions that the agency immediately make reasonable efforts to achieve that goal.

Affirmed.