Argued and submitted March 24, reversed May 27, 2009

In the Matter of A. J. T.,
a Minor Child.

STATE ex rel DEPARTMENT OF HUMAN SERVICES,
*Respondent,*

*v.*

R. T., Sr.
and K. D. F.,
*Appellants.*

Marion County Circuit Court
J060568;
Petition Numbers
010408TAY1, 010408TAY2;
A140245

209 P3d 390

Ann Lechman-Su argued the cause for appellant R. T., Sr. With her on the brief was Johnson & Lechman-Su, PC.

Megan L. Jacquot argued the cause and filed the brief for appellant K. D. F.

Jeff J. Payne, Assistant Attorney General, argued the cause for respondent. With him on the brief were John R. Kroger, Attorney General, and Erika L. Hadlock, Acting Solicitor General.

Before Haselton, Presiding Judge, and Brewer, Chief Judge, and Rosenblum, Judge.

HASELTON, P. J.

### HASELTON, P. J.

Mother and father appeal judgments terminating their parental rights in their son, A, on the ground that they are unfit, ORS 419B.504, and, with regard to father, on the ground that he neglected the child, ORS 419B.506. On *de novo* review, ORS 419A.200(6)(b), we conclude that the trial court erred in terminating mother's and father's parental rights because the state did not prove by clear and convincing evidence that integration of the child into parents' home was improbable within a reasonable period of time due to conduct or conditions that were not likely to change. Further, because the state did not prove the statutory grounds for neglect by clear and convincing evidence, the trial court erred in terminating father's parental rights on that alternative ground. Accordingly, we reverse the judgments terminating mother's and father's parental rights.

The circumstances material to our disposition are as follows. A was born in late June 2006, about six weeks prematurely and approximately a week after a domestic violence incident between mother and father. Although mother had taken drugs during the pregnancy, A did not have drugs in his system at birth. However, he experienced some "jitteriness," which Dr. Hassan, one of A's physicians, initially attributed to mild neonatal drug withdrawal. A couple of days after A was born, the Department of Human Services (DHS) obtained temporary custody and, several days later, A was placed in a foster home in which he would receive care from a provider with training in the care of premature and drug-affected children. A remained in that foster home for 20 months—that is, until March 2008—when DHS moved him to his potential adoptive home. A experienced some minor speech delays, but early intervention studies through the local educational service district indicated that A did not qualify for special services.

In late May 2008, a couple of months after A had been moved to his potential adoptive home and a couple of weeks before the termination trial in June, he was evaluated by Smith-Hohnstein, a licensed clinical social worker, who spent approximately 90 minutes with A and his parents and

60 minutes with A and his potential adoptive parents. Smith-Hohnstein noted that "[A] appears to have a defused/confused attachment to the adults in his life. In other words, he does not presently have a secure attachment." Smith-Hohnstein's report indicated that A would need "specialized attachment focused mental health treatment to assist [A] with his attachment confusion." Also, during trial, Smith-Hohnstein testified that A had the "potential for reactive attachment disorder" because he was not "demonstrating a secure attachment to anybody," but that she could not diagnose A with reactive attachment disorder.[1] According to Smith-Hohnstein, parents did not currently have the skills necessary to safely and adequately raise A. In sum, Smith-Hohnstein concluded:

> "I think it's fair to say that we have a child who has not developed a secure attachment as yet, who is at risk of developing reactive attachment disorder, who needs permanency and stability right now."

Similarly, Mullenaux, a social service specialist with DHS, testified that, at the time of trial, A needed a permanent placement. Further, she stated that parents were incapable of making necessary changes within a time frame that was reasonable for A in light of (1) the minimization of their behaviors and (2) the length of time that it would take "to then work with them as a couple to change the dynamics of their relationship—to completely avoid alcohol, drug use in the relationship and to communicate, disagree, resolve problems in ways that are not verbally or physically aggressive[.]"

---

[1] Smith-Hohnstein testified that reactive attachment disorder is

"just a description of a child who has the inability to attach, in a healthy way, to a caregiver.

"* * * * *

"* * * [I]t creates problems in that if you—you know, all of that you learn in your life is through your attachments, and your secure attachments is how you develop everything; from walking, crawling, talking, math, higher levels, plus your relationships. So if you're going to grow up and have strong, secure, loving relationships with other people you need to have a strong, secure attachment as a little child. So as children grow up with these attachment problems and they struggle with developing trust with other[s], they develop—they have conflicted relationships with other people. And children who are not treated and this continues to become a problem for them through their childhood often grow up to have personality disorders in adulthood."

During the period of time that A was in foster care, DHS offered mother and father a variety of services. Initially, their involvement with those services and their conduct were far less than exemplary. For example, mother and father were involved in another domestic violence incident in July 2006, father was arrested for rioting in September 2006, and, in February 2007, mother was sentenced to 18 months at Coffee Creek Correctional Facility after the revocation of her probation on criminal convictions that arose out of an incident that occurred before A's birth.[2]

Dr. Ewell, the state's psychologist, evaluated father in September 2006 and again in September 2007, approximately nine months before the termination trial. In the 2007 evaluation, Ewell diagnosed father with a personality disorder, not otherwise specified, with antisocial and passive-aggressive features. Ewell did not consider father to be a safe parental resource and concluded that "[t]he prognosis for change, even if [father] cooperate[d] with treatment, would be seen as poor."

Following Ewell's 2007 evaluation, father's level of cooperation with treatment and services did, in fact, change. For several months before the termination trial, father regularly visited A. Father had nearly 90 visits with A. Several of the DHS workers supervising father's visits had positive opinions about his interactions with A and the other children. Further, by the time of the termination trial in June 2008, father had attended a parenting class, had engaged in drug treatment, and was participating in domestic violence treatment.

Ewell also evaluated mother twice—first in August 2006 and, again, in May 2008. By the time of the 2008 evaluation, mother had been released from Coffee Creek. While

---

[2] Mother was convicted in August 2006 of two counts of delivery of a controlled substance to a minor and first-degree child neglect with regard to an incident involving her teenage sister that had taken place in November 2005. Father, who has a significant history of criminal convictions involving burglary and theft, was also convicted, based on the same incident, of possessing methamphetamine and endangering the welfare of a minor. Thereafter, mother violated her probation by submitting a urine sample that tested positive for methamphetamine, abusing her prescription medication, and continuing to have contact with father, even though a special condition of her probation required that she have no contact with him.

at Coffee Creek, mother had completed the STARR program, a residential program that provides mental health and drug abuse treatment. Mother had cognitive and dialectical behavior therapy and completed a variety of classes covering topics including parenting, addiction, relapse prevention, goal setting, and release planning. Myers, a mental health specialist at Coffee Creek with a master's degree in social work, testified that mother

> "worked very hard in the program. She learned a lot of coping skills to manage emotion regulation. She learned how to make better decisions. She learned how to manage her mental health symptoms. She learned about substance abuse and relapse triggers, relapse planning. She developed a plan for relapse prevention, and she successfully completed all the phases—one, two and three—successfully. And the goals that we had set forth she completed."

Mother's treatment and discharge plan indicated that mother "has worked conscientiously in all groups and classes (even complete[d] extra assignments). She has done good therapeutic work surrounding her past traumas and mental health issues." In addition, following her release from Coffee Creek, mother participated in other services such as drug treatment and a domestic violence program and had consistently visited A.

In the 2008 evaluation, Ewell diagnosed mother with (1) a personality disorder, not otherwise specified, with antisocial features, (2) methamphetamine dependence that was in remission by mother's self report, and (3) a depressive disorder, not otherwise specified. Ewell noted that mother had attended the STARR program and that there appeared to be changes in her thinking and functioning as a result. Nonetheless, and notwithstanding mother's continued participation in drug treatment and a domestic violence program, Ewell stated that, in May 2008, "[he] would not currently recommend that [mother] is prepared to independently assume responsibility for [A]." (Internal quotation marks omitted.)

Notwithstanding mother's and father's protestations at the termination trial that they were no longer a couple and were committed to a parenting plan in which A would

be integrated into father's home supplemented by mother's possible later involvement, it was patent, from Ewell's evaluations and the evidence presented at trial, that mother and father are, in fact, a couple and whether integration of A into their home is improbable within a reasonable time is properly assessed based on that premise. With regard to mother and father's ability as a couple to adequately care for A, a child with the potential to develop reactive attachment disorder, Ewell testified at the termination trial that mother and father "might be ready to parent if they continue to receive the individual kinds of treatment that they're in and if they receive treatment as a couple." He indicated that, given mother's and father's particular individual personality disorders and A's potential for reactive attachment disorder, he "would not be optimistic" about mother and father's ability to care for A together. Nevertheless, Ewell acknowledged that it would take three to five months "to give what I would consider an appropriate examination of the issues and come to a conclusion at that time."

Ultimately, the trial court terminated mother's parental rights on the ground that she is unfit.[3] ORS

---

[3] Specifically, the judgment terminating mother's parental rights provides, in part:

"3. The mother is unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the mother's home is improbable within a reasonable time due to conduct or conditions not likely to change, including the following:

"a) Criminal conduct that impairs the parent's ability to provide adequate care for the child.

"b) Addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability has been substantially impaired.

"c) Engaging in a pattern of relationships that involve domestic violence.

"d) Lack of effort or failure to obtain and maintain a suitable or stable living situation for the child so that return of the child to the parent is possible.

"e) Failure to present a viable plan for the return of the child to the parent's care and custody.

"f) An emotional illness, mental illness, or mental deficiency of such nature and duration as to render the parent incapable of providing care for extended periods of time.

"g) Lack of effort to adjust the parent's circumstances, conduct or conditions to make return of the child to the parent possible.

"h) Failure to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."

419B.504. The court also terminated father's parental rights on the grounds that he is unfit and neglected the child. ORS 419B.504; ORS 419B.506.[4]

In a letter opinion that the court incorporated into the judgments, the trial court essentially rejected parents' testimony and expressed serious concern about each parent's "personality deficits that have exacerbated those of the other," as well as their "minimization and, occasionally even, outright mischaracterization of their multiple drug and domestic abuse issues." The court noted that,

> "[b]efore [parents] can reasonably expect to be able to act as even a minimally effective primary custodial parent of a minor child, each parent must first get his or her own living situation under consistent self management and control, and stabilize their own current and future financial resources sufficiently, to provide for themselves, much less a family on a consistent and reliable basis."

For those reasons, and in light of child's need for permanency, the court concluded that "the [s]tate has carried its burden of proof as to the termination of the parental rights of each parent and that freeing this child for adoption without further delay would be in his best interest."

---

[4] The judgment terminating father's parental rights, provides, in part:

"2. The father is unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the father's home is improbable within a reasonable time due to conduct or conditions not likely to change, including the following:

"a) Engaging in a violent relationship with the child's mother.

"b) Failure to present a viable plan for the return of the child to the parent's care and custody.

"c) Failure to learn or assume parenting skills sufficient to provide a safe and stable home for the raising of the child.

"d) Lack of effort to adjust the parent's circumstances, conduct or conditions to make return of the child to the parent possible.

"e) Failure to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected.

"3. The father has failed and neglected without reasonable and lawful cause to provide for the basic physical and psychological needs of the child for six months prior to the filing of the petition as shown by his:

"a) Failure to provide care or pay a reasonable portion of substitute physical care and maintenance while custody was lodged with others."

Both parents appeal, assigning error to the court's determination that the state had proved by clear and convincing evidence that their rights should be terminated on the basis of unfitness. In asserting that the state failed to prove by clear and convincing evidence that integration of A into a parental home was improbable within a reasonable time, mother's and father's arguments appear to reduce to three pertinent considerations: (1) they had been engaging in substantial and sustained efforts, with respect to treatment and counseling as well as visitation with A, for several months before trial; (2) A did not suffer from special needs that required immediate permanency; and (3) the state's own expert, Ewell, acknowledged that he was unable, at the time of the termination trial, to render an opinion as to the likelihood that parents would be able to assume care of A within a reasonable time and that he would need an additional three to five months to do so.

The state disputes the ultimate efficacy of parents' efforts. In particular, the state contends that the trial court correctly concluded that integration of A into a parental home was improbable within a reasonable time because of the combination of two factors: First, parents "need substantially more time to address their problems." Second, "[A] needs permanency right now because he is in danger of developing reactive attachment disorder, and because he needs parents who can appropriately address his developmental delays."

In an additional assignment of error, father asserts that the trial court erred in terminating his parental rights on the basis of neglect, arguing that the evidence demonstrated that he maintained personal contact with A and that, although he had little disposable monthly income, he provided "in-kind support items, such as food, clothing and other necessaries." The state remonstrates that father's failure to pay court-ordered support is sufficient to justify termination of his parental rights on the ground of neglect.

■■ Our review of the parties' contentions is circumscribed and guided by well-established principles governing whether parents' rights should be terminated on the basis of unfitness. ORS 419B.504 provides, in part:

> "The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child or ward and integration of the child or ward into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change."

In applying that standard, the Supreme Court observed in *State ex rel SOSCF v. Stillman*, 333 Or 135, 145-46, 36 P3d 490 (2001):

> "ORS 419B.504 sets out a two-part test for determining whether to terminate parental rights, both parts of which must be met before the court orders termination. First, the court must address a parent's fitness: The court must find that the parent is 'unfit by reason of conduct or condition seriously detrimental to the child.' That, in turn, requires a two-part inquiry: The court must find that: (1) the parent has engaged in some conduct or is characterized by some condition; and (2) the conduct or condition is 'seriously detrimental' to the child. Second—and only if the parent has met the foregoing criteria—the court also must find that the 'integration of the child into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change.' That second part of the test for termination requires the court to evaluate the relative probability that, given particular parental conduct or conditions, the child will become integrated into the parental home 'within a reasonable time.' "

A "reasonable time" is "a period of time that is reasonable given a child or ward's emotional and developmental needs and ability to form and maintain lasting attachments." ORS 419A.004(20). "That inquiry is child-specific," *Stillman*, 333 Or at 146, and focuses on the circumstances that exist at the time of the trial concerning termination, *see State ex rel Dept. Human Services v. A. M. P.*, 212 Or App 94, 104, 157 P3d 283 (2007) (stating that "the state must prove more than unfitness at some point in the past, but rather must prove that the conduct or condition is seriously detrimental *at the time of the termination hearing*" (emphasis in original)).

■        "Termination requires that the state prove unfitness by clear and convincing evidence; that is, evidence that makes it highly probable that the parent is unfit at the time

of the termination trial." *State ex rel Dept. of Human Services v. R. O. W.*, 215 Or App 83, 99, 168 P3d 322 (2007). *See also* ORS 419B.521 (providing that the termination of parental rights must be based on facts established by clear and convincing evidence). Although our review is *de novo,* ORS 419A.200(6)(b), we defer to the trial court's credibility findings; however, "[t]o the extent that a credibility determination is based on a comparison of the witness' testimony with the substance of other evidence, this court is as well equipped as the trial court to make that credibility determination." *State ex rel Juv. Dept. v. G. P.*, 131 Or App 313, 319, 884 P2d 885 (1994).

With those principles in mind, we turn to their application in this case. We begin with two overarching premises. First, based on our review of the record and consistently with the trial court's findings that the parents are "emotionally enmeshed with one another" and that, "[d]espite their denials, their lives are quite likely to stay entangled with one another," we find that parents are a couple and that, despite their testimony about integrating A into father's home supplemented by mother's possible later involvement, they intend to care for A as a couple.

Second, we agree with the trial court that the state proved by clear and convincing evidence that mother and father are, individually, and collectively, *presently* unfit by reason of conduct or condition seriously detrimental to A. A comprehensive published discussion of the bases for that determination would not benefit the bench, bar, and public. It suffices to emphasize that, as the trial court found, mother and father have "personality deficits that have exacerbated those of the other." As already noted, at the time of the termination hearing, mother had been recently released from Coffee Creek, and she and father had not completed their domestic violence programs or stabilized their living situation. Further, both parents continued to minimize their drug and domestic violence issues. Thus, at the time of the hearing, mother's and father's conduct and conditions were seriously detrimental to A because they prevented them from providing A with a stable and safe environment at that time.

Thus, the issue of the propriety of termination pursuant to ORS 419B.504 reduces to whether the state proved by clear and convincing evidence that integration of A into parents' home is "improbable within a reasonable time due to conduct or conditions not likely to change." We conclude that the state did not meet its burden in that regard. Our conclusion is driven by three salient, but interrelated, considerations.

*First*, by the time of the termination trial, mother and father had made substantial and sustained efforts to address their drug abuse and domestic violence issues and they were maintaining consistent contact with A. In particular, mother had successfully completed a variety of relevant classes through the STARR program, and Ewell noted that she had exhibited progress in her thinking and functioning.

*Second*, although A had some minor developmental issues, he had not been diagnosed with reactive attachment disorder—indeed, the only testimony was that A was at some indeterminate *"risk"* of reactive attachment disorder. Further, the determination that A was "at risk" for developing the disorder was based on Smith-Hohnstein's single, short observation of A with parents and with his prospective adoptive parents—an observation that occurred within a couple of months after A's move to his potential adoptive home. Significantly, Smith-Hohnstein testified that, if A had been attached to his original foster parents, it was likely that he would attach to his adoptive family. Nonetheless, in rendering her opinion, Smith-Hohnstein had little information concerning whether A had formed attachments to the caregivers in his original foster home, where he had lived for approximately 20 months, before he was moved into his potential adoptive home.

*Third*, Ewell did not testify that A's return to parents was improbable within a reasonable time. Rather, he expressed a more nuanced and qualified view. Specifically, Ewell testified that mother and father needed a few months to demonstrate that they could reunite after mother's release from Coffee Creek and to address issues in their relationship as well as prepare themselves to meet child's needs and that, within three to five months, an appropriate examination

could occur to determine whether integration of A into their home could occur at that time or could occur within a reasonable period of time. In other words, as of the time of the termination trial, Ewell did not render an opinion as to whether integration of A into a parental home was improbable within a reasonable period of time. Rather, he indicated that he would need to wait an additional three to five months—and then, depending on the parties' circumstances, at that point, the prospects for integration could, presumably, range from highly probable in a short period of time to highly improbable ever, much less within a reasonable period of time.

In sum, our *de novo* review of the record persuades us, even giving due regard to the trial court's credibility determinations, that this is a case in which parents have, notwithstanding some very severe individual deficits, undertaken substantial, sustained, and continuing efforts to address the conditions and circumstances that render them historically—and (as of the time of trial) presently—unfit as parents. The ultimate efficacy of those efforts with respect to integration of A into parents' home within a reasonable period of time remained uncertain at the time of the termination trial, and, in the opinion of Ewell, it would take a matter of a few months to make that assessment.[5]

Nor was there any persuasive evidence that A would suffer any substantial detriment from waiting a few additional months in his prospective adoptive home, before achieving permanency, either by way of return to parents or, failing that, on termination of their parental rights and subsequent placement. The indeterminate "risk" that A will develop reactive attachment disorder is not, in the totality of the circumstances, sufficient to warrant termination under ORS 419B.504. *See State ex rel Dept. of Human Services v. Huston*, 203 Or App 640, 660, 126 P3d 710 (2006) (Brewer, C. J., concurring) (reasoning that, in a case in which a parent has

---

[5] As previously noted, Mullenaux, a social service specialist with DHS, testified that parents were incapable of making necessary changes within a time frame that was reasonable for A. *See* 228 Or App at 648. Her conclusion, however, appeared to be based on mother's and father's emotional deficits and their dynamic as a couple, topics about which Ewell rendered a more nuanced assessment.

both mental or emotional issues and substance abuse problems, "[i]f the child has few if any special needs and is psychologically healthy, * * * it is better to err on the side of giving a parent who is making progress toward addressing multiple deficiencies a more comprehensive opportunity to remediate them than would otherwise be the case"). *See also State ex rel Dept. of Human Services v. A. C.*, 228 Or App 403, 410-11, 209 P3d 328 (2009) (holding that the state had not carried its burden of proving that it was highly probable that the mother's child could not be returned to her custody within a reasonable time where, among other things, the state's expert testified that the mother might be able to parent within a reasonable period and suggested a four- to eight-month period of additional treatment). We thus conclude that the state has failed to establish by clear and convincing evidence that integration of A into parents' home is improbable within a reasonable period. Accordingly, the judgments terminating mother's and father's parental rights on the basis of unfitness must be reversed.

■ We proceed to father's second assignment of error concerning the trial court's termination of his parental rights on the basis of neglect. ORS 419B.506 provides, in part:

> "The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents have failed or neglected without reasonable and lawful cause to provide for the basic physical and psychological needs of the child or ward for six months prior to the filing of a petition. In determining such failure or neglect, the court shall disregard any incidental or minimal expressions of concern or support and shall consider but is not limited to one or more of the following:

> "(1) Failure to provide care or pay a reasonable portion of substitute physical care and maintenance if custody is lodged with others."

In this case, father testified that he had been ordered to pay support for A but had not done so. However, the evidence in the record is that he has little disposable income after paying for necessities such as rent, insurance, and the fees for his and some of mother's required services to address their various needs. Under those circumstances and in light of his substantial efforts to address his issues and his record

of consistent and positive contacts with A, we conclude that the state has not established the statutory grounds for neglect by clear and convincing evidence.

Reversed.