Argued and submitted March 29, reversed and remanded June 29, 2011

In the Matter of H. I. J., aka H. J.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

L. E. G.,
*Appellant.*

Washington County Circuit Court
J080178;
Petition Number D3J080178;
A146893

260 P3d 586

Holly Telerant, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Appellate Division, Office of Public Defense Services.

Stephanie Striffler, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Rosenblum, Senior Judge.

ORTEGA, P. J.

## ORTEGA, P. J.

Father appeals a judgment terminating his parental rights to his daughter, H. Mother, who stipulated to termination of her parental rights midway through the termination trial, is not a party to this appeal. Because we conclude that the Department of Human Services (DHS) did not demonstrate, by clear and convincing evidence, that it was improbable that H could be integrated into father's home within a reasonable time, we reverse the judgment of termination.

We state the pertinent facts as we find them on *de novo* review. ORS 19.415(3)(a). In addition, we defer to the trial court's demeanor-based credibility findings, but, " '[t]o the extent that a credibility determination is based on a comparison of the witness' testimony with the substance of other evidence, this court is as well equipped as the trial court to make that credibility determination.' " *State ex rel Dept. of Human Services v. R. T.*, 228 Or App 645, 655, 209 P3d 390 (2009) (quoting *State ex rel Juv. Dept. v. G. P.*, 131 Or App 313, 319, 884 P2d 885 (1994)) (brackets in *R. T.*).[1]

H was born in April 2008. Because of concerns related to mother's drug use and her history of involvement with DHS, a caseworker contacted mother in the hospital when H was two days old. Mother admitted having used marijuana while pregnant, and drug tests administered in the hospital revealed the presence of opiates and amphetamines in H's system. Accordingly, DHS immediately took H into protective custody and placed her in substitute care.

Mother had ongoing issues with the abuse of drugs and alcohol and had four children older than H, all of whom were in guardianships with relatives. In addition to her substance abuse issues, mother had been diagnosed as having a personality disorder "[n]ot [o]therwise [s]pecified [w]ith [p]assive-[a]ggressive [f]eatures and [a]ntisocial [f]eatures[.]" Throughout the case, DHS offered mother services aimed at helping her to resolve those impediments to her ability to parent H. However, mother continued to test positive for

---

[1] Here, the trial court found father not to be credible because "[h]is testimony [was] full of inconsistencies."

drugs and to drink on occasion, and her mental health issues remained unresolved. Midway through the termination trial, after the court observed that mother was having trouble staying awake during the proceedings, mother agreed to take a drug test. After the test came back positive for marijuana, mother stipulated to the termination of her parental rights.

Because father was not listed on H's birth certificate and mother did not inform the caseworker of his identity at the hospital, father was not included in the initial dependency petition filed with the court shortly after H's birth. However, mother gave DHS father's name and contact information several days later. The agency contacted him, and father signed a paternity affidavit in July 2008, but told a caseworker then assigned to the case that he wanted a paternity test. That testing was not completed, however, until H was a year old. By then, the case had been transferred to another worker, who set appointments for mother and father to be tested in February 2009 and took H to be tested in April 2009. Even though DHS received the results later that month, and father wrote a letter to the court in May asking to be part of the case, he was not added to the case until four months later, in September 2009. Until then, although father voluntarily attended court hearings and meetings with DHS, he was not appointed counsel to represent him.

Father was born in Cuba and is one of 11 children. He attended some college and then went into military service. In 1994, he left Cuba and eventually became a permanent resident of the United States. During the pendency of the case, father was employed with a moving company and made, on average, between $400 and $450 each week. He did not have a current driver's license and generally took the bus to work, shop, and run other errands. At the time of trial, he was in the process of renewing his green card, which had expired in 2007.

Father became involved with mother in 2005, and they have lived together off and on since then. For about a year during the early part of this case, they shared a small room in a house that would not have been appropriate for H for a number of reasons, including that it was small and that

their roommates had histories of involvement with child welfare. Since leaving that residence, father has lived with a roommate; the roommate's girlfriend lived with them for several months and mother stayed overnight there at times, though she did not live there. Father, in fact, has lived in several places over the course of H's life. At the time of trial, father and his roommate were being evicted from the house they shared, although father stated that they had wanted to move and that he had money set aside to pay for the move to a new residence. Father had given DHS his roommate's information and a background check did not reveal any criminal or child welfare history; the roommate's girlfriend was not planning to live in the new residence.

Although father was aware of mother's history of drug use and was aware that mother's four other children had been removed from her care, he minimized that concern, indicating that mother had not used drugs in his presence. Furthermore, although he knew that she had positive drug tests, father maintained that he did not know if mother was actually using drugs and that he believed she would not do so in the future. He was not concerned about mother's use of alcohol in moderation. Although, at times during the life of the case, father indicated to caseworkers that he was no longer involved with mother, the two apparently broke up and reconciled repeatedly. And, although he stated at the beginning of trial that they were no longer romantically involved, she had most recently stayed with him only a couple of days before that. After mother stipulated to termination of her parental rights during the course of the trial, however, father stated that, in light of the clear proof of mother's drug use, he would not allow her to visit H and she would no longer be in his life.

For most of H's life, DHS has focused its efforts and services on mother. The worker who handled the case initially indicated that, although mother was asked to engage in various screenings and treatment relating to drugs, alcohol, and mental health, DHS waited to work with father until receiving the results of the paternity testing that he had requested. Pedraza, the worker who took over the case in September 2008, indicated that the only services offered to father initially were visits with H. Pedraza also indicated

that father expressed to her that, in his view, a child should be with her mother, regardless of what problems the mother has. Pedraza discussed mother's problems as a parent with father, but did not dispute his view that a child should be with her mother, a view which Pedraza attributed to father's cultural background.

Hally, who was the caseworker assigned to this case as of the time of trial, received the case from Pedraza in August 2009. As noted, father was not added to the case until that September, 17 months after it was first filed, and Hally's first contact with him was at a family decision meeting held that month. Although the meeting focused a great deal on services for mother, Hally explained to father that he would need "to have a safe and stable home, clean and sober living, [and] a means of income to provide for [H's] basic needs." She also discussed parenting classes and explained to father the current safety risks that mother would pose to H. During that meeting, father again stated that one should not remove a child from her mother and that, in Cuba, a child would not be taken from her mother regardless of what the mother's problems were.

Even before he was made part of the case, father, along with mother, consistently attended visits with H. During those visits, father was calm, appropriate, and attentive to H. He would feed her, care for her needs, carry her, talk to her, and play with her. She recognized him and was happy to see him. Mother also demonstrated appropriate parenting during those visits.

A family decision meeting was held in July 2010, approximately one month before the termination trial, to consider father as an independent resource for H. He was informed that he would need to complete custody paperwork, to obtain appropriate child care, to provide DHS with a budget, and to obtain a driver's license. He was also to speak with his employer about adding H to his health insurance and then locate a pediatrician. However, at trial the following month, he had not yet obtained a current license, nor had he added H to his insurance or found a pediatrician. He stated that his license was suspended and that he would need to pay approximately $1,000 for some outstanding tickets. He

obtained the required custody paperwork, but had not yet completed it. In addition, although he had looked into some child care options, he had not yet secured appropriate child care; he was informed mid-trial that his roommate's girl-friend, who had agreed to provide child care, had a child welfare history and was not an acceptable child care provider. Hally also indicated that, before H could be returned to father, his relationship with mother would need to be clarified—including clear boundaries with mother—and he would need to have a minimum of six months in a stable residence.

Before he had been made a party to the case, father had refused DHS's request that he engage in a psychological evaluation; he explained that he was not crazy and expressed a fear that he would "come out crazy" if he submitted to an evaluation. However, father agreed to an evaluation with Sandra Gonzalez, a Spanish-speaking psychologist, in October 2009, after being added to the case. Gonzalez concluded that father did not suffer from a mental health disorder, nor did he have any intellectual deficits that would interfere with his ability to parent. Indeed, he rated 80 out of 100 on the "Global Assessment of Functioning," indicating that he functions reasonably well. Father indicated to Gonzalez that he would start a parenting program evaluation at Evergreen Counseling, and Gonzalez indicated that, although father has not been diagnosed with a mental illness, he would benefit from completing that parenting program so that he could "acquire the important parenting skills needed for him to appropriately care for his child." Gonzalez expressed concern about father's belief that a mother should always have custody of her children, because it suggested that father might have trouble protecting child from mother. In addition to recommending that father complete the parenting class and possibly "parent coaching," Gonzalez noted that, "[g]iven that [father] has been showing more interest lately, treatment might be successful. He should be given at a minimum 6 months to show some progress in treatment." Further, in response to DHS's referral question regarding the "likelihood that [father] can overcome his belief that children should be placed with their mother even if she is unsafe[,]" Gonzalez explained that she had "seen other parents with

strong beliefs, such as [father's], change with treatment. It is possible that [father] can alter his belief about children needing to be returned to their mother's care at all costs. It just might take some time, * * * 6 months at a minimum."

Father successfully completed the infant-toddler parenting class referred to in the psychological examination, as well as an anger management class. DHS did not refer him to either class (though it did refer mother); rather, father took the classes voluntarily and attended consistently, even when mother was not there. According to the parent trainer's report, although father began the classes as a silent observer, after several sessions he became an active participant and showed a good understanding of the material covered, which addressed "[a]ttachment, communicating with little people, empathy and communicating feelings, basic care * * *, play, children's development, anger, self-care, and positive discipline." The trainer described father as "calm, rational, and thoughtful" in class and stated that he showed the ability to "connect what he was learning to thinking about his own childhood, and describe what he wanted for his child."

Meanwhile, H, who was 29 months old at the time of trial, had been living with the same foster family since she was two days old. She was colicky as a small infant, but that issue resolved after several months. She also had ear infections and had to have tubes put in her ears when she was 13 months old. Otherwise, H did not have any medical problems.

By the time of trial, H was potty trained, slept through the night, and was speaking in full sentences. She had started walking at around one year old and was coordinated, could climb well, and could pedal a tricycle on her own. Her foster father described her as "the smartest kid [that had] ever come through [their] house[,]" including their own biological children. H was very strong-willed and would become frustrated if she did not get her way, but could communicate well and express herself. She was bonded with her foster family and was close to her foster sister. She was also bonded with her biological parents and siblings.

H received early intervention services in the form of home visits from an early childhood education specialist

starting when she was about 18 months old. As of trial, the specialist had spent 10 visits educating H's caregivers about how to work with her. The services are available to children ages birth to three who either have demonstrated a developmental delay or who are considered at risk for such delays. H was referred to the program by her pediatrician and was found eligible to receive the service because she was at risk for having fetal alcohol exposure, which, in turn, placed her at risk for developmental delays. She has not, however, been diagnosed with fetal alcohol effect. After services were provided, the family saw improvement in H's frustration level; her tantrums decreased and her play skills improved.

Based on the early intervention training they have received, H's foster family keeps her on a schedule, including naps. Her routine is important to her and disruptions to her schedule often result in episodes of crying, a short temper, and tantrums. H's foster family was identified by DHS as the adoptive resource, and they consider H a part of their family. Her foster mother also testified that, if H was returned to father, she would be willing to work with father so that he could understand H's routine in order to ease the transition for H.

The juvenile court terminated father's rights based on unfitness pursuant to ORS 419B.504 because of (1) his relationship with mother and lack of insight and understanding regarding mother's serious deficits as a parent; (2) his unsuitable living situation and failure to formulate a viable plan for caring for H; and (3) his "inability or lack of desire or effort to adjust his circumstances to meet [H's] needs over his or mother's needs even after repeated reasonable efforts by DHS[.]" On appeal, father contends, among other things, that DHS failed to demonstrate by clear and convincing evidence that integration of H into father's home was unlikely within a reasonable time.

ORS 419B.504 provides:

"The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reasons of conduct or condition seriously detrimental to the child or ward and integration of the child or ward into the home of the parent or parents is

improbable within a reasonable time due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:

"(1) Emotional illness, mental illness or mental retardation of the parent of such nature and duration as to render the parent incapable of providing proper care for the child or ward for extended periods of time.

"(2) Conduct toward any child of an abusive, cruel or sexual nature.

"(3) Addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability had been substantially impaired.

"(4) Physical neglect of the child or ward.

"(5) Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make it possible for the child or ward to safely return home within a reasonable time or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected.

"(6) Criminal conduct that impairs the parent's ability to provide adequate care for the child or ward."

"The facts on the basis of which the rights of the [parent or] parents are terminated, unless admitted, must be established by clear and convincing evidence[.]" ORS 419B.521(1).

"ORS 419B.504 sets out a two-part test for determining whether to terminate parental rights, *both parts of which must be met* before the court orders termination. First, the court must address a parent's fitness: The court must find that the parent is 'unfit by reason of conduct or condition seriously detrimental to the child.' That, in turn, requires a two-part inquiry: The court must find that: (1) the parent has engaged in some conduct or is characterized by some condition; and (2) the conduct or condition is 'seriously detrimental' to the child. Second—and only if the parent has met the foregoing criteria—the court also must find that the 'integration of the child into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change.' That second part of

the test for termination requires the court to evaluate the relative probability that, given particular parental conduct or conditions, the child will become integrated into the parental home 'within a reasonable time.' "

*State ex rel SOSCF v. Stillman*, 333 Or 135, 145-46, 36 P3d 490 (2001) (emphasis added). Thus, if DHS fails to satisfy either part of that test by clear and convincing evidence, a parent's rights cannot be terminated pursuant to ORS 419B.504.

Furthermore, whether a time period is "reasonable" is evaluated in light of "a child or ward's emotional and developmental needs and ability to form and maintain lasting attachments." ORS 419A.004(20). The inquiry is "child-specific," *Stillman*, 333 Or at 146, "and focuses on the circumstances that exist at the time of the trial concerning termination," *R. T.*, 228 Or App at 654. "It calls for testimony in psychological and developmental terms regarding the particular child's requirements." *Stillman*, 333 Or at 146.

In this case, even assuming that the juvenile court was correct in concluding that father is unfit—a conclusion that we think is far from clear on the facts presented here— termination was, in all events, improper because DHS failed to establish by clear and convincing evidence that integration of H into father's home was improbable within a reasonable time due to conduct or conditions unlikely to change. *See Dept. of Human Services v. T. C. A.*, 240 Or App 769, 780, 248 P3d 24 (2011) (declining to decide whether the mother was unfit because, "in any event, DHS failed to prove that the children's integration into mother's home [was] improbable within a reasonable time").

Here, the conduct or conditions at issue are father's lack of an appropriate living situation for H and his ongoing involvement with mother, whose unresolved drug, alcohol, and mental health issues pose a risk to H. However, on this record, it appears that those conditions could be ameliorated within a fairly short period of time. With respect to father's living situation, at the time of trial, father was going to have to move into a new residence. He and his roommate were being evicted and planned to move, but his roommate did not have a criminal or child welfare history, and father had

money set aside to pay for the move. Although the case-worker indicated that father needed to demonstrate his stability by being in an appropriate home for a minimum of six months, it appears that father could resolve the issue regarding his living situation in a period of six months—by moving into an appropriate residence and showing stability for that period of time.

With regard to father's involvement with mother, we first observe that the circumstances of this case changed a good deal during the course of the trial, given mother's positive drug test mid-trial and her later stipulation to termination of her rights. Nonetheless, it appears from the psychological evaluation that father's issues relating to mother could be resolved in a period of approximately six months. Specifically, the evaluator indicated that father's belief that children should remain with their mothers—a belief that father has often articulated and that apparently is related to his Cuban culture—could possibly be changed, but that such a change would take some time. She believed a minimum of six months of treatment would be required.[2]

Furthermore, here, as in *T. C. A.*, there is no evidence in the record regarding how such a delay in achieving permanency would affect H's "emotional and developmental needs or [her] ability to form and maintain lasting attachments." 240 Or App at 781. The record indicates that H is a happy, healthy, intelligent child who is bonded to both father and her foster family. She is strong-willed and is prone to frustration and tantrums, but does well with a consistent schedule and attentive parenting. The record does not reflect that H has specific emotional or developmental needs that would be negatively affected by a six-month delay in achieving permanency, nor that such a delay would be unreasonable in light of her specific needs. Thus, we cannot conclude, on

---

[2] As noted, Gonzalez specifically recommended that father complete the parenting class for which he had already signed up. That particular eight-week class, which father attended on his own initiative rather than because of a DHS referral, was directed generally toward infant and toddler care, including attachment, communication, basic care, development, and discipline. It did not relate to the issue identified, and we do not consider it to have comprised the "treatment" referred to by the evaluator that could, in a minimum of six months, help father to alter his belief that children should stay with their mothers at all costs.

this record, that it is improbable that H can be integrated into father's home within a reasonable time. Accordingly, the trial court erred in terminating father's parental rights.

Reversed and remanded.