214 P.3d 1 (2009)
229 Or. App. 619
In the Matter of L.G.T., a Minor Child.
State ex rel. Department of Human Services, Respondent,
v.
R.J.T., Appellant.
060918J, A139670.
Court of Appeals of Oregon.
Argued and Submitted on January 21, 2009.
Decided July 15, 2009.
Gay Canaday filed the brief for appellant.
*2 Laura S. Anderson, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.
Before LANDAU, Presiding Judge, and SCHUMAN, Judge, and ORTEGA, Judge.
ORTEGA, J.
Mother appeals from a judgment terminating her parental rights to her youngest child, L. We review the record de novo, ORS 419A.200(6)(b), and affirm.
Before reviewing the facts in detail, we begin with this overview. This case involves the youngest of mother's three daughters, L, whom mother adopted in February 2005 at the age of 20 months. (Her two older daughters, R and E, are the children of her first and second marriages, respectively; she has stipulated to termination of her parental rights as to R and, as of the time of trial in this matter, E was living with her father and was not involved in this proceeding.) Not long after adopting L, mother's mental health began to deteriorate; mother has been diagnosed with major depression and borderline personality disorder, each of which can lead to suicidal ideation. In March 2006, when L was not quite three years old, the Department of Human Services (DHS) became involved because of referrals concerning mother's possible suicide attempts.
While L and her older sisters were in mother's care, mother's conduct repeatedly exposed them to indications that mother was not safe. Although mother made some effort to shield them from her suicide attempts and self-harming behavior, they were exposed to that conduct by witnessing police responses to her reports of her suicidal ideation and by seeing marks of self-inflicted cuts on her legs. The children have been out of mother's care since June 2006. While out of mother's care, R was accidentally exposed to one apparent suicide attempt, and R and E were recklessly or deliberately exposed to another during a scheduled visit.
Mother was hospitalized because of suicidal ideation or suicide attempts on five occasions in 2006. In 2006 and 2007, mother participatedto varying degreesin services, including a parenting class, individual therapy, a dialectical behavior therapy (DBT) program, and an alcohol detoxification program. Although mother was not hospitalized for suicidal ideation or attempts in 2007, she continued to harm herself and to experience suicidal ideation, and she was unable to maintain a stable living situation.
In 2008, in the months before the termination trial, mother made two suicide attempts, resulting in a hospitalization. Later, mother gambled away most of her paycheck and then made a sufficiently serious expression of suicidal ideation to merit a police response.
Meanwhile, L has been out of mother's care for two years. Although L generally is well adjusted, in part because of the stability of her longstanding relationship with her foster parents, she is anxious and needs a lot of reassurance. L is at a heightened risk of harm because of multiple disruptions that she already has experienced in her short life and because of a history of mental illness in her biological family. Despite enjoying visits with mother, L feels anxious about mother's safety. If returned to mother, L would be at significant risk of mimicking mother's self-harming behaviors and experiencing guilt and depression as a result of her inability to save mother. We conclude that mother's continuing suicide attempts and her struggle with mental illness pose a serious risk of emotional harm to L; that L cannot return to mother within a reasonable time, given that L needs permanency now and mother still lacks control over her self-destructive behaviors; and that being freed for adoption is in L's best interests.
We turn to a more detailed examination of the facts. Mother's self-harming and suicidal conduct was more extensive, and L and her sisters were exposed to that conduct or its aftermath more frequently than the dissent suggests. Although the dissent finds our recital of the facts "a litany of mother's character flaws, psychological problems, and bad conduct," 229 Or.App. at 642, 214 P.3d at 13 (Schuman, J., dissenting), this evidence is highly pertinent to whether mother has the *3 ability to control her behaviors and prioritize her children's needs so as to provide a secure home for L.
L was born in June 2003. When she was a few months old, DHS removed L from her biological parents' home. After a couple of weeks in medical foster care, L was placed with her paternal great-aunt. While L was in that placement, mother provided daycare for L. L's great-aunt experienced health problems that created difficulty in caring for L, so mother became L's foster parent in January 2004 and adopted L in February 2005.
Mother had some history of mental health issues.[1] When she was 16 years old, she inflicted cuts on her legs for a brief period. At age 18, she was hospitalized for suicidal feelings. After that, mother was not hospitalized again until 2006, when she was 37 years old.
During those intervening years, mother's life was sometimes chaotic, but the record does not suggest that she was an unfit parent. In 2005, however, her mental health began to deteriorate. Mother began therapy in November because she was upset about a letter from her own mother, which mother felt was an expression of abandonment. The letter "started her on [a] path" of anxiety and depression, according to her therapist, Dr. Dykstra, "but after that it was the depression itself [that] * * * was the primary force." Dykstra, who continued providing therapy to mother throughout this case, initially diagnosed her with major depression. Borderline personality disorder was later added to her diagnosis.
The symptoms of mother's borderline personality disorder are, according to Dr. Krechman, a psychologist who evaluated mother's mental health, "impulsivity, poor decision making, an inability to regulate emotions and affect, and particularly anger, substantial difficulty in relationships, volatility in relationships, suicidal gestures and acting out, self-harm behavior, and chronic feelings of emptiness, serious negative response to any perceived rejection or abandonment." According to a psychologist who evaluated L, borderline personality disorder is not an absolute barrier to safe parenting, but it affects a parent's ability to provide a "basic level of day to day consistency and stability":
"[T]he borderline parent is likely to have times when they're very good and very on and very involved with the child, but other significant periods of time when they're distant, rageful, and when their own behavioral issues escalate to self-harming behaviors such as drug abuse or gambling or spending sprees or self-harming behavior that the child becomes very confused about[,] emotionally very anxious * * *[.][A] child will become very careful and walk on egg shells trying to keep the parent from escalating and deteriorating, and not know how but feel very responsible and be hyperattuned to try and say and do things to keep the parent happy or get them back to the stable period of time."
Mother also suffers from major depressive disorder, a severe form of depression. Krechman explained that a major depressive episode "suggests that there's some biochemical difficulty that is creating some symptoms * * * and usually the symptoms include things such as * * * feelings of hopelessness, worthlessness, sometimes suicidal ideation * * *." Mother reported episodic depression since adolescence, with 2006 being the most serious period.
As mother's mental health deteriorated, she cut herself, experienced suicidal ideation, and made suicide attempts. Mother testified that she went to a park two or three nights per week to cut herself. In January 2006, according to treatment records, mother slit her wrists twice. According to R, mother became "careless" about the children's safety, and she placed more and more responsibility on R, who was 13 or 14, to supervise the younger children. She left R in charge of E, who was eight years old, and L, who was not yet three, about three or four nights *4 per week, while mother went to the library or a park, returning from one to six hours later. Mother began coming home later and later, sometimes not returning until 11:00 p.m.
R found mother's razors and cutting tools in places where the younger girls could have touched them. Although mother denied that the children saw her cut herself or saw her legs, R explained that mother walked around the home while she was getting dressed, and R "started seeing more and more [cutting marks] like around her thighs mostly." The marks were in a square with multiple cuts, sometimes bleeding. When R, who was worried, tried to talk to mother, mother said it was none of her business.
Although mother apparently did not make calls relating to her suicidal ideation from the family home, emergency responders came to the home in response to such calls. R testified that police came to the home on about five occasions in 2006, while the children were living with her, and that mother was never there when the officers arrived. An officer testified that, over the course of 2006, police made 13 calls to mother's home to respond to suicide threats or attempts. On the occasions when the officer spoke to mother, she minimized the reports and claimed there was no problem.
On one occasion, mother placed R in the middle of a crisis intervention. Mother was out at 3:00 a.m. L and E were asleep, but R was awake. R heard police officers arrive. When R opened the door,
"then like my whole living room was full of cops and paramedics and asking, `Where is [mother]? Where is she?' And I was like, `I don't know. She's not answering her phone. I don't know where she is,' and then I was on the computer and they were just standing there staring at me, and she finally text[ed] me and asked me if they're gone yet, and I said no. So she said, `Okay, call me when they're gone,' and I saidI told them that she's not going to probably be home for awhile, and so they all left except for one officer sat in front of the house and just sat there in his patrol car, and I just kept texting her saying, `No, they're not gone yet, no,' and she's like, `Okay. I'll be home when he's gone.' So then he finally left and she came home."
As mother's mental health deteriorated, she was hospitalized several times. According to mother, on some occasions, she made arrangements for the children's care before being hospitalized, but once or twice when she was taken to the hospital, R "had called people before I left and they were coming."
Mother was first hospitalized in early March 2006. A day or two before entering the hospital, mother placed L with Kathy and Michael, who cared for L during mother's later hospitalizations as well and eventually became L's foster parents. Mother claimed at the time that she would not do anything to harm herself, because it would negatively affect her children, and attributed earlier calls to a crisis line, which resulted in police responding to her home, to "blowing off steam verbally." During that hospitalization, DHS received referrals but, because mother had arranged for appropriate caregivers, did not remove the children.
Mother was next hospitalized in late May. Before that hospitalization, she took excessive doses of Vicodin on two occasions and once required stitches on her leg because she had cut so deeply. Mother was hospitalized after she took eight to 10 Vicodin and four or five Ativan and drank several beers. DHS received another referral regarding that hospitalization.
About a week later, mother was again hospitalized, after a friend reported a concern that mother was attempting suicide. All three children were home when police responded, and L was awake. In the hospital, mother reported taking six to eight Vicodin, which she attributed to tooth pain, but denied a suicide attempt. Her toxicology screen was essentially negative, and she was discharged. Mother later acknowledged that she had felt suicidal at that time. DHS received yet another referral, and mother entered into a field service agreement with DHS regarding where the children would stay.
Believing that mother was still in the hospital, R went home to pick up clothes the next day. She arrived to find empty prescription *5 bottles lying around and mother in bed, groggy, lying on bloody sheets with two beer bottles and a box cutter nearby. R took the box cutter and confronted mother, telling her that "she shouldn't be doing this. She's hurting my sisters and she's hurting me, and she shouldn't be doing that * * *." Mother responded by yelling at her and, in the ensuring confrontation, when R took the box cutter and threw it outside, mother slapped R. DHS received a referral regarding the incident, which also led to charges against mother for harassment and fourth-degree assault. A few months later, mother pleaded guilty to assault and was placed on probation. DHS cited that incident in subsequent petitions concerning L and R.
Mother later blamed R for the family's problems and stated that R had overreacted and was bipolar. Mother retreated from that position in a psychological evaluation, during which she reported that she no longer was angry at R and that she had never blamed R but noted feeling at times that R was "manipulating a little bit." At trial, mother maintainedcontrary to a psychologist's evaluation of R  that R "seemed to either have some manic episodes or maybe some other traits of something going on."
After those events, mother began various treatment programs. In late June, mother began intensive outpatient services at Providence Portland Medical Center (Providence). Then, from late August to early January 2007, mother participated in a 19-week DBT program and, for the first couple of weeks, also attended a group for treatment of Vicodin abuse.
DBT is recognized as an effective therapy for borderline personality disorder, which is not susceptible to treatment with medication. It emphasizes a structured, skill-oriented approach to help people manage their emotions and gain control over destructive behaviors. The Providence program includes a weekly two-hour group session and individual therapy. Group skills work is a valuable part of the program. Mother missed several sessions and left several sessions early, so she missed some information in each module of the program. Mother's individual DBT therapist, Gantt, observed that mother's level of engagement varied. At times mother was very motivated, but in stressful situations she had difficulty thinking about appropriate skills to use. Overall, her motivation to use DBT skills was modest.
DBT is a comprehensive treatment program that typically includes a therapy team trained specifically in that form of therapy. The program involves monitoring to avoid inconsistency. In the strictest version of DBT, the client sees only the DBT therapist and cuts off other therapeutic contacts so as not to receive inconsistent information from providers. The Providence program was willing to allow some limited contact with Dykstra, who thought it would be devastating for mother to be cut off from her established therapeutic relationship.
Meanwhile, mother's suicidal ideation and self-harming behaviors continued. In August 2006, mother experienced suicidal ideation and took all of her Zoloft in one day; later that month, she cut the words "It's time to say bye" on her leg, which became infected. She also checked Internet sites concerning overdosing and suicide on a nightly basis.
In September, mother successfully completed a parenting class, but she was hospitalized twice that month. From September 2 to 6, mother was hospitalized for suicidal ideation. Then, on September 14, mother was hospitalized after she exposed E and R to an apparent suicide attempt. Mother had requested a visit with E and R that evening. Although R was resistant to visits, her caregivers made her go as a step toward healing. When the girls and their caregiver arrived at mother's home for the scheduled visit, the caregiver had a feeling that something was not right, so she had the girls wait in the living room while she went to check on mother in the bedroom. The caregiver found mother unconscious with a suicide note. Both E and R were very scared by the incident, and E was in tears.
According to the hospital records, mother reported having taken 10 Ativan and some Seroquel in an attempt to hurt herself. Later in the hospital stay, mother claimed that she had just wanted to sleep and that every-one *6 had overreacted, and she denied knowing that E and R were due to visit. Medical records note that, although mother was very sedated and difficult to rouse and had reported overdosing on Ativan, urine tests "surprisingly" were negative for all substances tested. The hospital nevertheless held her for an overdose.
After those incidents, DHS obtained protective custody orders for L and R. After the September hospitalizations, mother avoided hospitalization for about a year and a half but continued to engage in self-harming behaviors. In October, mother cut herself, and mother's physician, Ruggeri, called the police once because of a report that mother was harming herself. Mother frightened her friends by leaving a good-bye message and then ignoring their efforts to reach her. In November, mother again experienced suicidal ideation and tore off her toenails.
Meanwhile, mother had begun another form of self-harming behaviorabusing alcohol, which she later attributed to the fact that she had been feeling "bored, that she's a hands-on parent and was bored and had nothing to do." According to mother's trial testimony, she began having one or two drinks per night in June 2006; her drinking gradually increased, and she realized around November 2006 that she was drinking too much and should seek help. In treatment, however, mother had reported a longer period of more extensive substance abusehaving 10 to 12 drinks of hard alcohol per day since June 2006 and, before that, taking 10 to 12 Vicodin (which she purchased from friends) daily for about two years.
In December 2006, while still in the DBT program, mother participated in a day residential program. The following month, mother completed a two-week in-patient residential program for alcohol detoxification. Mother attended group sessions and, though she initially had difficulty becoming comfortable and motivated, actively participated. However, she rejected the recommendation on discharge that she seek housing in an Oxford House (a group home for recovering addicts).
When mother was discharged from the detoxification and DBT programs in late January, Gantt, Dykstra, and mother met to discuss what she would do next. Gantt had recommended that mother redo modules of DBT, which is often beneficial to clients. However, mother resisted, stating that she had completed the modules and did not want to miss any more work. Instead, mother and Dykstra decided to work on DBT together; mother said that she also would complete an intensive outpatient substance abuse program and go to a sobriety support group such as Alcoholics Anonymous. Although mother was evaluated by the outpatient program, which recommended intensive outpatient treatment, she declined treatment, citing scheduling problems.[2] Mother completed DBT worksheets that she obtained online and then reviewed them during therapy appointments with Dykstra, who found mother to be a willing participant and believed that she made progress through that approach to DBT.[3] Dykstra acknowledged that, although she had taken a couple of seminars concerning DBT, she is not an expert in that particular therapy.
Although mother was not hospitalized for suicidal ideation or attempts in 2007, she continued to experience suicidal ideation and to harm herself. Medical records reflect that mother's physician, Ruggeri, was called by one of mother's friends because of a suicide threat in February, was paged by the suicide hotline in March, and was paged by one of mother's friends because of mother's worsening depression in May. Mother had thoughts of suicide or cutting in February, March, April, June, July, and October. In November, mother took extra Seroquel when she was depressed, though she denied being suicidal at that time.
*7 Mother was unable to maintain stable housing. In October 2006, she was evicted from the home that she had shared with the children, despite the fact that DHS had paid $1,900 in back rent a few months earlier. She was required to vacate her next home in June 2007.[4] For a period in the summer of 2007, mother did not disclose to DHS where she was living. She started living with a friend in October 2007 and remained there at the time of trial, but the friend had asked her to move out because mother was paying rent late and because the friend did not want her own daughter to witness "everything that's going on." The friend also testified that her daughter's narcotics prescription went missing a few weeks before trial and that mother was the only person with access to it. Although mother was accepted to an Oxford House residence during trial, she was uncertain whether she could come up with the deposit.
In 2008, before trial, mother made efforts to voluntarily participate in services, but was inconsistent in her attendance. She also continued to engage in self-harming behaviors, including two incidents of shoplifting. She attempted suicide and expressed suicidal thoughts.
In February, mother's care providers became concerned about increased dangerous behaviors and considered hospitalizing her. In mid-February, mother took 20 Oxycodone, but she denied any suicidal intent. At the end of the month, mother was admitted to a hospital for severe depression and suicidal ideation; she had drunk alcohol and taken Seroquel on the way to the hospital. While in the hospital, mother again denied any suicidal intent. Treatment providers strongly recommended that mother attend an intensive outpatient program, but she declined, citing her finances. When mother was discharged, the treating doctor felt that her risk of harming herself was low, but noted "some chronic elevated risk due to her situation and history."
Mother acknowledged at trial that she had used alcohol excessively before that last hospitalization. She testified that she had, after discussion with her doctor, gone off Seroquel and that, although she could not remember what led up to the events, "I remember just feeling really overwhelmed and really upset about a lot of things that were going on and just made that choice." Mother noted that her drinking on that night was "quite common with borderlines and people with suicidal thoughts that they will do something to try to calm the emotion."
In mid-May, mother lost almost her entire paycheck gambling and then, because her rent was due and her money gone, became depressed and experienced suicidal ideation. She called a colleague of her therapist, who called the police as a result. Police responded to mother's home to check on her well-being. Mother was living with a friend; when police arrived, neither mother nor her friend were at home, but the friend's 16-year-old daughter was. Mother later attributed her depressed feelings, in part, to having been "ignored for Mother's Day." At a later visit with L, mother asked L why she did not call on Mother's Day and expressed that she had looked forward to talking to her that day. At trial, mother took the view that she had taken care of herself because she had been able to calm herself and did not require hospitalization. She denied any continuing  suicidal ideation, attributing the incidentwhich took place one month before trialto gambling and financial pressures.
Mother continues to carry diagnoses of borderline personality disorder and depression. Although Dykstra described mother's case as in the mild to medium range, Krechman placed mother at the more severe end of the continuum.
Mother had psychological evaluations with Krechman in November 2006 and December 2007. In the first evaluation, Krechman recommended that, to be a safe parent, mother should, at a minimum, "demonstrate no less than six months of stability in functioning (no *8 hospitalizations, suicide threats or attempts, alcohol or drug abuse, etc.). A year or longer is ideal. Repetition and completion of DBT with a more solid investment in the treatment is strongly suggested * * *." During the second evaluation, Krechman concluded that mother was willing to do services only on her own terms, which did not bode well with her ability to change.
Krechman testified that, although mother had made some progress by the time of trial, she still, when distressed and unable to effectively manage her feelings, acted out in extremely dangerous ways and harmed herself. The decrease in hospitalizations suggested that therapeutic services were helping mother, but "it is still very concerning that hospitalization happened again and that * * * mother was suicidal and depressed. * * * [T]hat suggests that there's an ongoing difficulty and problem that may require more support and services and more treatment." Given mother's history, Krechman "would want to see stability and functioning and engagement in sessions and treatment, probably beyond six months," before mother would be ready to parent. In the view of Dr. Eastman, the psychologist who evaluated L and R, in order to be a safe placement for L, mother would need to demonstrate at least one to two years during which she did not engage in self-harming behaviors or substance abuse and showed emotional and physical stability.
Meanwhile, L has remained in the care of her foster parents, Kathy and Michael, for two years, since June 2006. They are her prospective adoptive placement. Mother often relied on Kathy and Michael to babysit L, starting for a few hours per week in February 2004 and increasing over time. Before mother's adoption of L was finalized in February 2005, Kathy and Michael were caring for L two or three days per week. L thus has had stability in that relationship. Eastman attributed L's resilience to that "security base" and thought that L would be at risk of severe depression if she lost that psychological family relationship. According to L's therapist, Crutchfield, L has a secure primary attachment to her foster parents and an ambivalent attachment to mother. Eastman likewise thought that L felt anxiety and confusion about her relationship with mother.
While L has been in that placement, mother has visited regularly, with the exception of a period in the fall of 2007, when she cancelled eight visits in a 10-week period. Vang and Lewis, who were visit supervisors, testified that visits generally were very positive. During some visits, though, mother upset L by insisting that L not refer to her foster parents as her parents;[5] mother eventually gave L permission to do so, after Crutchfield conveyed the effect mother's behavior was having on L. According to Crutchfield, L presented with anxiety and anger because mother would not allow her to have two mothers. Such anxiety is common among foster children, but L focused on the issue in each session, wanting Crutchfield to explain to mother that L's foster mother was also her mother. Crutchfield spoke with mother before a visit and conveyed the concerns that L was expressing. During a later visit, mother told L that it was okay for her to call the foster parents mom and dad, although L understood mother to mean only that L could do so on that particular occasion.
L is doing well overall, although she needs a lot of reassurance. Despite being generally well adjusted and happy, L can be sensitive and quick to experience anxiety with stress or change. L's foster parents noted, for example, that L can appear a bit apprehensive and cautious. Eastman concluded that L had a very strong need for stable, secure care. Crutchfield explained that, in addition to L's anxiety about who to call "mommy," L generally presents as "pretty anxious in that if she does not have a secure, structured plan for the day for the next day, then she can very easily become undone." In Crutchfield's assessment, L "is in limbo. The therapy is stuck and until [L] receives permanency, all this therapist can offer is a sounding board for her feelings." *9 Eastman expressed the belief that L would benefit from ongoing therapy to address her anxiety about the permanency of her current placement and "anxiety and guilt about [mother] and her relationship with her and her responsibility for her."
L has displayed some awareness of self-harm. In her psychological evaluation, L engaged in symbolic play relating to concerns about safety:
"She wanted to make sure the baby was safe and protected. The characters in the play scenario frequently were hurt, through scratches and cuts. They would get better, and then be hurt all over again. There would be an escalation of being `mean' and then the `scratching' would occur. The characters would get better and `put on a happy face,' and then the cutting would start all over again."
That kind of symbolic play, involving suicidal and self-harming behavior, is very rare; Eastman, who has 30 years' experience conducting psychological examinations, sees it with about one in 1,000 children she evaluates.[6] It typically appears with a bright child who has been exposed to repeated anxiety about parental safety and generally where the parent "may not only have suicidal depression, but borderline personality disorder with the ups and downs [that are] very extreme and confusing to a child."
The play theme arose twice during Eastman's time with L, and L wanted to repeat it during the part of the evaluation that included mother. During that portion of the evaluation, mother was warm, affectionate, and eager to connect with L. However, mother "wasn't able to connect with her on the theme that [L] was presenting so mother tried to connect in other ways." Mother "tended to be bombarding [L] with yes's and information," until L finally left the play room and needed reassurance from mother and the foster mother before she would return.
In talking with Eastman about mother, L was "clear that she thinks that [mother] has been `sick' and that she will get better. She believes that `her not think right' and was `mad all the time.' She especially hopes that [mother] can not be `so mad at [her foster mother].'" L's relationship with mother was characterized by L's anxiety about mother's safety "and confusion about her mother's irritability and volatility, and then there were times when the relationship was very positive. So that yo-yo effect was creating more confusion for her, and she had considerable anxiety about her mother's being, quote, `Sick,' and whether her mother would be safe * * *." Eastman concluded that L enjoys playtime with mother, but views mother as very emotional and angry at times. Krechman similarly testified that mother's hospitalizations and crises would "create[] a lot of feelings of unsafety and anxiety and uncertainty and unpredictability, and also the child doesn't learn how to effectively manage their own distress if their parent isn't capable of doing that and modeling that themselves."
In Eastman's assessment, although L did not display signs during the evaluation that she was engaging in self-harm, she would be at high risk for self-harm, including cutting or scratching and suicidal behavior, if she were in mother's care, because mother continues to model those behaviors. Mother herself has, at least once, recognized the danger that L might imitate such behavior. According to a November 2005 progress note by mother's therapist, mother reported that she had "made a decision to live * * *. Youngest told her she would kill herself too'woke her up.'"
In Eastman's view,
"the most significant risk is that [L] would witness [a] suicide attempt by mother or some of the episodic acting out behaviors that would be possibly lethal, and she would carry that guilt and burden that she couldn't fix her mom or save her mom, or that she would witness her mother's self-harming behavior and begin mimicking it *10 or being very confused and frightened by it. So that to me is an extremely high risk and a very significant concern."
Simply witnessing police responding to concerns about mother's safety or other adults worrying about suicide attempts would be similarly detrimental to L. As Eastman testified, from a child's perspective, it does not matter whether a suicide attempt is driven by attention-seeking behavior or self-destructive behavior associated with depression; either behavior is damaging to the child. Crutchfield explained that young children like L are very concrete and egocentric and may believe that they have done something to cause problems or suicidal ideation.
Mother does not appear to understand the danger that her conduct poses to L. Krechman testified that mother may be incapable of paying adequate attention to the emotional needs of others and is likely to place her own emotional needs above those of her children. In speaking with Eastman, mother dismissed the suggestion that L felt concerns over mother's emotional functioning; mother felt that L knew that "mother was safe and trusted that completely, and that [L] overreacted to minor injuries such as bug bites." Although mother showed some awareness by not engaging in cutting or suicide attempts in front of L, Eastman explained that children can pick up on such things without anyone telling them.
L is at a heightened risk of emotional harm. L has experienced multiple disruptions already, moving from the care of her biological parents to a relative, to mother, and then to the foster parents; the multiple disruptions place L at risk for attachment difficulties, anxiety, and depression. In addition, L's biological family has a history of mental illness (her paternal grandmother had schizophrenia) and substance abuse (by her parents). A child with that biological family history is more vulnerable to risks of living with problems such as mother's. Eastman testified that waiting even six more months for permanency would be very difficult for L because L has "waited far too long already" and "has not had any sense of closure or progress that her mother is better over the last two years."
The termination trial was held in June 2008, shortly after L's fifth birthday. In a letter opinion, the juvenile court explained its conclusion that mother's mental illness rendered her unable to care for L. Relying primarily on mother's conduct in 2008 to assess her present fitness, the juvenile court explained that, regardless of the reasons for mother's conduct, she continues to engage in self-harming behaviors that do not create a stable or secure environment for a five-year-old child. The court concluded that L could not be reintegrated into mother's home within a reasonable time, in light of L's immediate needs, and that termination was in L's best interests.
The grounds for termination must be proved by clear and convincing evidence, ORS 419B.521(1), which is evidence that makes the asserted fact highly probable, State ex rel Dept. of Human Services v. A.M.P., 212 Or.App. 94, 104, 157 P.3d 283 (2007). ORS 419B.504, the basis for termination in this case, provides, in part:
"The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child or ward and integration of the child or ward into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:
"(1) Emotional illness, mental illness or mental retardation of the parent of such nature and duration as to render the parent incapable of providing proper care for the child or ward for extended periods of time.
"* * * * *
"(5) Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make it possible for the child or ward to safely return home within a reasonable time or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time *11 that it appears reasonable that no lasting adjustment can be effected."
Under that statute, we first consider whether the parent has engaged in conduct or is characterized by a condition and whether the conduct or condition is seriously detrimental to the child. If so, we then consider whether it is improbable that the child may safely be returned to the parent within a reasonable time. State ex rel Dept. of Human Services v. Smith, 338 Or. 58, 80-81, 106 P.3d 627 (2005); State ex rel. SOSCF v. Stillman, 333 Or. 135, 145, 36 P.3d 490 (2001). A "reasonable time" is a period "that is reasonable given a child or ward's emotional and developmental needs and ability to form and maintain lasting attachments." ORS 419A.004(20). If the grounds for termination are proven, then we consider whether termination is in the child's best interests. ORS 419B.500.
Here, mother contends that her conduct is not the sort of behavior that would justify termination of her parental rights. In her view, she has engaged in services, despite financial strains, and has made substantial progress in overcoming her self-harming behaviors; her conduct cannot be seriously detrimental to L, because she made appropriate arrangements for L's care and because "L was and is bright, energetic, and resilient." Mother argues that, in light of her willingness to engage in further services, L can be returned to her care within six months. Finally, mother contends that termination is not in L's best interests because L is bonded to mother.
DHS responds that mother's conduct renders her unfit and is unlikely to change within a reasonable time, given that mother, particularly in times of stress, continues to struggle with instability and to engage in self-harming behaviors after two years of services. DHS contends that mother's conduct is seriously detrimental to L because, despite L's resilience, she is sensitive, anxious, and in need of permanency. In light of L's immediate need for permanency and mother's continued instability, DHS argues, L cannot be returned to mother within a reasonable time, and termination is in L's best interests. We agree.
We begin with mother's present conduct and conditions. More than two years after DHS became involved with the family, mother continues to engage in the sort of conduct that made her unable to care for her children: expressing suicidal ideation and engaging in self-harming behavior. Mother continues to have major depressive disorder and borderline personality disorder, conditions that underlie her self-harming conduct.
Mother's conduct is seriously detrimental to L. If L were to be returned to mother, L would very likely be exposed to mother's self-harming conduct and suicidal ideation, either directly or indirectly. L has already lived in a place where police and paramedics came late at night to check on mother's well-being. L has likely seen evidence of cuts on mother's legs, a theme that emerged in L's psychological evaluation. In instances that did not directly involve L but that present a troubling view of the risks to L, mother slapped R when she confronted mother about self-harm, blamed R for the family's problems, and exposed R and E to a suicide attempt that coincided with a visit that mother had scheduled. L's awareness of mother's conduct would likely increase as L grows older; it is hard to imagine that this bright, sensitive child would not question why mother is hospitalized.
Conduct that presents serious risks may be deemed detrimental to a child before the potential harm comes to pass. See, e.g., State ex rel Dept. of Human Services v. J.S., 219 Or.App. 231, 261-62, 182 P.3d 278 (2008) (focusing on the threat of future harm to the child from the mother's continuing methamphetamine use and drug dependence where the child had been in the state's custody since his birth). Here, mother's self-harming conduct threatens L's well-being. L's therapist and the psychologists who evaluated mother and L identified serious risks, including the danger that L would mimic mother's self-harming behaviors. If returned to mother, L would, according to Eastman, likely suffer depression as a result of the disruption of her current placement, and mother seems unlikely to model safe ways for L to address such depression.
*12 In addition, the risk that L will develop a painful sense of responsibility for mother's suicidal ideation or self-harming seems especially great. Mother attributed her alcohol abuse to being bored without her children, and she partially attributed her depression, with ensuing suicidal ideation, one month before trial to her children's failure to call on Mother's Day. Although mother undoubtedly loves L, mother's conduct places a tremendous burden on a young child to fill mother's emotional needs, and mother does not appear to recognize with any consistency the effects of her conduct on L. As one witness observed, mother loves her children, but at times she cannot take care of herself, let alone a child. L, who faces additional risk factors associated with earlier disruptions and her biological family's mental health history, would face very real risks as a consequence of mother's self-harming and suicidal conduct.[7]
We recognize that "perfection in parenting is neither attainable nor required." State ex rel Dept. of Human Services v. Simmons, 342 Or. 76, 103, 149 P.3d 1124 (2006). Here, however, mother's conduct at the time of trial falls too far short of providing a secure environment. Cf. id. at 101-03, 149 P.3d 1124 (concluding that the mother's personality disorder was not seriously detrimental to the child after the mother completed drug abuse treatment, where the child was doing well and the mother had accepted responsibility for past problems so that the child understood that she was not responsible for the mother). Mother's suicide attempts and suicidal ideation create risks of severe emotional harm, as well as physical harm if L imitates mother's behavior. Although L is doing well in the care of her foster parents, mother's conduct is seriously detrimental to L. Contrary to the dissent's view, 229 Or. App. at 658-59, 214 P.3d at 21-22 (Schuman, J., dissenting), we are not removing L from a troubled but minimally adequate parent: Mother's uncontrolled self-harming behaviors create serious emotional risks to L, who is more vulnerable than the average child, and also create the risk that L will mimic mother's self-harming behaviors.
Having concluded that mother's conduct is seriously detrimental to L, we consider whether it is improbable that L can be reintegrated into mother's home within a reasonable time. Krechman suggested that mother should demonstrate at least six months of stability before L could be safely returned, and Eastman thought that mother would need at least a year. In the months immediately before trial, however, mother attempted suicide more than once. Two years after L left mother's care, mother still had not achieved stability in avoiding suicide attempts and suicidal ideation. L needs a sense of closure and a safe, stable home. *13 Given L's pressing need for permanency, it is improbable that L can be reintegrated into mother's care within a reasonable time.
Finally, we consider whether termination is in L's best interests. L has a secure primary attachment with her foster parents, who wish to adopt her. They have provided her with stability when mother could not, and L already views them as her parents. L's bond with mother, on the other hand, is marked by anxiety and ambivalence. Although continuing contact with mother may be beneficial to L, termination of mother's parental rights is in L's best interests.
Affirmed.
SCHUMAN, J., dissenting.
SCHUMAN, J., dissenting.
The majority concludes that the Department of Human Services (DHS) proved by clear and convincing evidence that mother is unfit by reason of conduct or conditions that are seriously detrimental to L and that termination of mother's parental rights in L is in L's best interest. ORS 419B.504; State ex rel. SOSCF v. Stillman, 333 Or. 135, 145-46, 36 P.3d 490 (2001). I disagree. DHS presented no evidence that mother's conduct or conditions have already had a serious detrimental effect on L, and the evidence of future detriment is speculation that does not even approach the clear and convincing standard. I therefore dissent.

I. HISTORY
With respect, I find the majority's rendition of the facts to be a litany of mother's character flaws, psychological problems, and bad conduct. I offer what I hope is a more complete, balanced, and therefore accurate picture.

A. Events leading to L's removal from mother's home

L was born on June 7, 2003. When she was four months old, DHS removed L from her biological parents' home because they were substance abusers and severely neglected her. She was placed temporarily with her great-aunt. The great-aunt hired mother to provide childcare for L, and, after the great-aunt's health began to deteriorate, mother became L's foster parent in January 2004. Mother's other two children, E and R, were six and 11 years old at that time.[1] Mother began full-time employment in June 2004. By April 2005, she was working for the federal government and earning $41,000 per year. She continued to hold that position at least part time through the time of trial.
Mother adopted L in February 2005. Although the record does not disclose the screening and application process that mother underwent before the adoption, a DHS caseworker testified that the process typically requires
"a progressive study, * * * in depth home study, which is looking at every aspect of that person's life goingdelving into their childhood, talking to family members about that individual's childhood, and if there's any kind of trauma that might cause concerns. In addition to that of course they would be looking for references[,] checking financial stability[, and] looking at just the overall scheme of things for this individual to be able to provide for a safe and stable home for [the child]."
The caseworker testified that the adoption process also requires a check of the potential adoptive parent's mental health history.
In mother's case, that history would have revealed that, at age 16, she briefly engaged in "cutting behavior" (apparently a form of noncosmetic self-mutilation) and that, when she was 18 years old, she was hospitalized for depression and suicidal ideation. Mother was not hospitalized again or treated for a mental illness until late 2005, when she was 37 years old. At that time, mother's mental health began to deteriorate, due, apparently, to a disturbing letter she received from her own adoptive mother. She started therapy for borderline personality disorder. As mother's mental health deteriorated, she again engaged in cutting behavior. She testified, however, that she never cut herself *14 while the children were home because she was trying to maintain normalcy for them, and that she stopped cutting in August 2006.
In March 2006, mother was hospitalized for suicidal ideation. Before her hospitalization, mother arranged for L to stay with mother's friends Kathy and Michael, who frequently provided childcare for L. The hospital made a referral to DHS, but the referral was coded as "unfounded" because mother had made appropriate plans for all three children prior to her hospitalization. In May 2006, mother was again hospitalized for suicidal ideation. The hospital made another referral to DHS, but the referral was coded as "unable to determine" because mother again had made appropriate plans for all three children, including leaving L with Kathy and Michael.
On June 9, 2006, mother was hospitalized for a possible suicide attempt after a friend, suspecting that mother might have overdosed on medication, called the police. The police left L and E in the care of 14-year-old R. A school counselor made another DHS referral; this referral was coded as "unable to determine" because "mother denied the attempted suicide but acknowledged she had taken some pills." Subsequent toxicology reports indicated that mother had not overdosed on medication. Rhoades, the caseworker who responded to the referral, asked mother "if she would agree to her children staying elsewhere" until Rhoades could confer with Cady, the caseworker assigned to mother's case. Rhoades wrote, "[Mother] initially didn't want to agree with the arrangement, then finally agreed. * * * [Mother] was very upset * * *." Rhoades arranged temporary placements for the children, placing L with Kathy and Michael.
The next day, R found mother with cutting tools and prescription bottles. When R confronted mother, mother slapped R on her cheek, leading to another DHS referral. This referral was coded as "`founded' for physical abuse." Cady told mother that, "until her mental health issues were stabilized and she was in compliance with her treatment, the children should remain out of the home. [Mother] reluctantly agreed to this and signed the [voluntary service agreement] form."

B. Events following L's removal from the home

On August 8, 2006, mother pleaded guilty to fourth-degree assault for slapping R and was placed on probation. On September 2, 2006, mother was hospitalized again for suicidal ideation; records indicate that she was distraught over DHS involvement with her family and was missing her children. On September 14, 2006, mother was hospitalized for overdosing on psychiatric medications; she denied that the overdose was intentional. In October 2006, mother was evicted from her apartment because of unpaid rent.
DHS filed a dependency petition, and the juvenile court took jurisdiction of L on December 4, 2006. L remained with Kathy and Michael. Mother's service agreement required, among other things, that she maintain stable housing, attend visits with her children, enroll in parenting classes, and participate in Dialectical Behavior Therapy (DBT), a therapeutic method developed to treat borderline personality disorder.
Although the service agreement required that mother maintain stable housing, Gordon, another caseworker assigned to mother's case, testified that mother "definitely has struggled with her living situation in the last two years." In June 2007, mother moved in with a friend after agreeing to vacate her apartment because she failed to pay a month's rent. In August 2007, she moved into her own studio apartment, and, in October 2007, she moved in with another friend. At trial, mother testified that she recently had been accepted at Oxford House, a home for people recovering from drug and alcohol addictions, and that L could live with her there.
The record reflects, however, that mother complied with the other requirements of the service agreement. Mother participated in DBT, completing the modules in January 2007. Gordon testified that mother completed the parenting program that was specified in the service agreement and regularly attended visits with L. A DHS visit supervisor testified that L appeared to enjoy her visits *15 with mother; that mother exhibited good parenting skills; and that he never had to intervene or disrupt a visit. Another visit supervisor testified that mother's visits with L were positive; that he had "no concerns" about their interactions; that on two occasions he interrupted visits when mother failed to notice a safety concern, but that mother usually parented L appropriately; and that, although mother cancelled a few visits due to illness, she never otherwise failed to attend a visit. A parenting consultant who observed mother's visits with E and L expressed concern because mother "struggled to parent both children at the same time" and devoted disproportionate attention to E.
Around the time that L was removed from mother's home, mother increased her alcohol consumption. She testified:
"I started having one or two drinks at night, and slowly throughout the next five months it built up. * * * I realized that I was probably consuming too much, and I didn't want to have my children see me and go through what I went through with my parents. So I made the decision that I was going to seek some outside intervention."
Mother checked herself into an inpatient detoxification program in January 2007. DHS filed a second dependency petition, alleging that mother was abusing drugs and alcohol and needed treatment, but that petition was dismissed following mother's completion of a drug and alcohol evaluation at Providence Portland Medical Center (Providence). That evaluation, conducted on May 29, 2007, concluded, "Though we find that [mother] would be appropriate for * * * outpatient chemical dependence treatment, we feel she may have adequate support at this time. We are willing to defer to her wishes to avoid outpatient chemical dependence treatment at this time * * *."
Following mother's discharge from the detoxification program, her DBT therapist recommended repetition of the DBT modules, but mother was reluctant to repeat the program, citing work conflicts and her desire to continue seeing her individual therapist. Instead of insisting that mother repeat the modules, which would have required that she work only with the DBT therapist, the DBT therapist approved mother's alternate plan of individual therapy, online DBT program participation, outpatient drug and alcohol treatment, and participation in a sobriety support program such as Alcoholics Anonymous (AA). The record reflects that mother continued to attend individual therapy, participated in the online DBT program, and attended at least a few AA meetings, but did not participate in outpatient drug and alcohol treatment. Mother testified that, based on the Providence evaluation, she believed that she was not required to participate in an outpatient treatment program.
At a permanency hearing on July 26, 2007, the court approved changing the plan for L to adoption, concluding:
"Mother has had on and off again commitment to services. While she is now functioning better she is a far cry away from the ability to remain stable and meet the needs of a young child. Additionally, her illness and substance use and abuse has resulted in [L] forming healthy attachments to another care provider.
"* * * * *
"Despite mother's current ability to be `stable' and refrain from self harm and self medication, she is at best managing to care for herself. Based on mother's tenuous mental health and the lack of attachment that her adopted daughter has to her, great harm would come to [L] to force her to try to return home to her mother."
The source of the court's finding that L had a "lack of attachment" to mother does not appear in the record; the record indicates that L's therapist reported only that L had "both pieces of an ambivalent attachment" to mother.
Mother's relationship with DHS began to deteriorate. In the fall of 2007, she cancelled eight out of 20 supervised visits with L, enough that DHS decided to discontinue one of her two weekly visits. Mother objected to the reduced visitation time, however, and DHS agreed to expand mother's remaining weekly visit from one hour to two. DHS referred mother to another parenting program, *16 but the program twice discontinued services based on mother's poor attendance. At the time of trial, mother had reenrolled in the parenting program. Mother's caseworker, Gordon, testified that, for a period of three or four months, mother revoked the release allowing Gordon to talk with mother's therapist, Dykstra. Dykstra, however, testified that she chose to stop speaking with Gordon because
"[i]t was my impression that the information I was giving Ms. Gordon was not being treated confidentialwith confidentiality. Information I was giving her was coming back to me through * * * [mother]'s friends and family in an exaggerated fashion, and also the court documents that I've shown from some of the earlier hearings had information that I had given Ms. Gordon in an exaggerated manner."
Gordon also testified that mother had revoked the release because Dykstra "didn't want to talk to [DHS] anymore." On September 27, 2007, DHS filed a petition to terminate mother's parental rights as to L.
In January 2008, and again in February, mother was arrested for shoplifting; the first case was dismissed in exchange for her guilty plea in the second. In February 2008, mother was hospitalized for suicidal ideation and because she had overdosed on prescription medication. On May 16, 2008, mother called Dykstra's office because she again felt suicidal. Mother told the on-call therapist that, because she had lost her paycheck gambling, she could not afford rent and would not be able to get her children back. Mother's primary care physician, Dr. Ruggeri, testified that that incident was sparked by mother's stress related to "a combination of upcoming court dates." Ruggeri stated, "I think her primary stressor is the status of her children and whether or not she's going to have custody or not. I think that's a large part of stress for her."
During trial in June 2008, mother was cited for improperly using a disabled parking permit. Mother testified that she qualified for the permit based on injuries that she sustained in a car accident. She told a police officer, however, that the permit belonged to her ex-husband's mother.

C. Psychological evaluation of mother

Mother participated in the first of two psychological evaluations with Dr. Krechman on November 10, 2006. Krechman determined that "[t]he previous diagnosis of Borderline Personality is appropriate" and also diagnosed mother with "Major Depressive Disorder, stable with medications." Krechman reported that mother "denies any current urges to self harm," but concluded that, although
"[a]t the time of this evaluation [mother] was presenting a trouble-free picture, * * * she had been hospitalized only two months earlier and since this evaluation, has started abusing alcohol and is now in treatment. Thus, she is not presently considered stable enough to be a safe and adequate resource for her children."
Mother participated in a second evaluation with Krechman on December 10, 2007. Following that evaluation, Krechman wrote:
"It is this evaluator's opinion that [mother]'s functioning is somewhat improved in that she has not, to anyone's knowledge, been psychiatrically hospitalized in the past year. Her sessions with her individual therapist have decreased * * *, reportedly due to her increased stabilization. She continues to take medications, per her report, and sees the prescribing doctor each week * * *."
However, Krechman expressed concern about "a number of discrepancies between her self-report and information in the records," noting that DHS could not verify whether mother had followed through on alcohol and drug treatment and DBT because mother had revoked releases for DHS to have contact with her providers; that mother had abused alcohol; and that mother "has moved several times in the past year and has had one eviction." Krechman concluded that
"[mother] denies and minimizes the majority of her difficulties. She overestimates her level of functioning, despite many facts to the contrary, is somewhat entitled, and has unfortunately gotten herself into a major power struggle with DHS. These issues *17 are reflective of her personality difficulties. * * *
"* * * * *
"[Mother]'s history suggests that when she deteriorates, she becomes a significant risk to herself and to those in her environment. If she were to experience another depressive episode or relapse on alcohol, she would likely be at risk for self harm."
The factual basis for Krechman's assertion that mother "becomes a significant risk to * * * those in her environment" is not evident from the record. In any event, Krechman determined that, "[a]t this time, [mother] is not considered a viable custodial resource for these children." Krechman testified, "Given the history I would want to see stability and functioning and engagement in sessions and treatment, probably beyond six months," before L was returned to mother.

D. Psychological evaluation of L

L participated in a psychological evaluation with Dr. Eastman on June 25, 2007. Before the exam, Eastman received and reviewed background material on mother from DHS. The exam itself lasted only three hours, 30 minutes of which were observation without interaction. L was four years old at the time. Eastman observed that "[L]'s play themes were very significant. She wanted to make sure the baby was safe and protected. The characters in the play scenario frequently were hurt, through scratches and cuts. They would get better, and then be hurt all over again." Eastman testified that such "symbolic play * * * reflected anxiety about safety * * * which I sensed was her trying to come to terms with her mother's suicidal behavior."
Eastman noted that L "generally does not have any emotional or behavioral issues. She is very social around other children. She has not had any behavioral difficulties." She concluded that L "is generally affectionate, social, and well adjusted and happy." However, she testified that, if L were removed from her placement with Kathy and Michael, "the risk to her would be severe depression related to the loss of her psychological family with * * * the foster parents." Further, she testified, "[t]he other risk that I'm concerned about is that [L] would begin integrating borderline personality disorder dynamics as her way of coping with emotions." Eastman summarized her recommendations as follows:
"[Mother]'s depression, borderline personality disorder, and the severity and chronicity of her difficulties bode poorly for her to be able to be a stable and safe, full time parent to [L]. * * * [L] does not need the emotional trauma of having to caretake her mother, witness mother's further decompensation, and/or be present when mother may finally kill herself. This is too high of a risk and return of [L] to her mother is not recommended."
Eastman testified that mother should be stable for "a minimum of a year, optimistically two years given the severity and chronicity and frequency of the difficulties," before L was returned to her care.
L's therapist, Crutchfield, also testified. She based her testimony on eight therapy sessions with L, one visit with mother, a one-hour observation of interaction between mother and L, and over 75 pages of "case history," including Eastman's evaluation. Crutchfield reported that L had anxiety related to having "two mommies"; she did not report any other source of anxiety. She noted disapprovingly that, at one point, mother had asked L, "Why didn't you call me on Mother's Day?" and, further, that mother took L to see films that were "not appropriate" (Monster House and one of the Harry Potter movies). She also reported that mother's borderline personality disorder would have "insidious and long-term" detrimental effects on L: in Crutchfield's opinion, returning L to mother would increase her level of anxiety and could lead to depression.

E. Trial court judgment and opinion

On July 25, 2008, the trial court issued a judgment terminating mother's parental rights as to L. The court attached and incorporated a letter opinion explaining its decision:
"For purposes of this letter opinion, * * * the court will concentrate on [mother]'s mental illness which is of such nature and *18 duration that it renders her incapable of providing care for extended periods of time.
"[Mother] has been diagnosed with Borderline Personality Disorder.
"* * * * *
"In 2008, most significantly, [mother]'s self harming thoughts have continued. In late February and early March 2008, [mother] again experienced suicidal ideation and was hospitalized. * * *
"In addition to her suicidal ideation, the record shows that [mother]'s living situation continues to be unstable. * * *
"She also continues to engage in impulsive, self detrimental conduct. In May 2008, she lost $900 (almost her entire paycheck) gambling. * * *
"* * * * *
"Also indicative that her DBT therapy has not been adequately effective is her criminal conduct in 2008. In January, she was arrested for shoplifting and then again on February 15. * * *
"In addition, during the trial of this case in June 2008, while one would expect she would make every effort to make a positive impression and do nothing to jeopardize her position, [mother] continued to engage in wrongful behavior * * *. Specifically, she used a disabled parking permit which she had stolen from a relative. * * *
"That is not a stable living situation for any child and not one where a five year old would feel secure. Frankly, [mother] is sufficiently challenged trying to take care of herself in moments of distress. Although she loves [L] dearly, the added challenge of raising a young child (in and of itselfseparate from the inevitable stresses that one must face) would be an added stressor and not safe for either individual."

II. DISCUSSION
The trial court terminated mother's parental rights under ORS 419B.504. That statute
"sets out a two-part test for determining whether to terminate parental rights, both parts of which must be met before the court orders termination. First, the court must address a parent's fitness: The court must find that the parent is `unfit by reason of conduct or condition seriously detrimental to the child.' That, in turn, requires a two-part inquiry: The court must find that: (1) the parent has engaged in some conduct or is characterized by some condition; and (2) the conduct or condition is `seriously detrimental' to the child. Secondand only if the parent has met the foregoing criteriathe court also must find that the `integration of the child into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change.'"
Stillman, 333 Or. at 145, 36 P.3d 490 (quoting ORS 419B.504, in part). If all of the foregoing requirements are met, the court must also decide whether the termination of parental rights is in the best interest of the child, ORS 419B.500, measured at the time of trial. State ex rel Dept. of Human Services v. Simmons, 342 Or. 76, 95-96, 149 P.3d 1124 (2006).
Guided by these precepts, I conclude that the state failed to prove by clear and convincing evidence that mother's conduct or condition was seriously detrimental to L. Because I reach this conclusion, I do not address whether integration of L into mother's home is "improbable within a reasonable time," ORS 419B.504. See Stillman, 333 Or. at 145, 36 P.3d 490 (integration inquiry necessary only if serious detriment found).
Further, I do not consider whether termination is in L's best interest. I understand that not taking that factor into consideration runs counter to our natural inclination to protect children and to enable them to flourish. However, under ORS 419B.504, in a contest between a neurotic, dysfunctional, criminal, or otherwise marginal parent who, despite these qualities, can provide minimally adequate care for a child, on the one hand, and the state, which may have identified an adoptive placement where the child will probably thrive and flourish, on the other, the bad parent wins. Some would say we have chosen to sacrifice children on the altar of parental rights. Others would point out that a regime in which bad parents can lose their *19 children when the state finds what it regards as better parents can easily degenerate into a dystopia where every parent must live in fear that some bureaucrat will decide that another parent is more deserving. In any case, under well-settled state and federal law, sometimes bad parents win and, as a consequence, children lose.
Further, the state authorities charged in the first instance with deciding whether to seek termination of parental rights do not, I presume, choose their calling because they want to protect bad parents; they choose it because they want to help children. Yet under our statutory and constitutional law, helping children by taking them from a bad but marginally competent biological parent and placing them with an obviously better one is (to put it bluntly) illegal. The child's best interest, in other words, enters into the calculation only when the state has proved by clear and convincing evidence that the parent's conduct or conditions have a seriously detrimental effect on the child.

A. Conduct or condition

I conclude that the only conduct or conditions potentially rising to the level contemplated by that statute are mother's mental illness and its direct behavioral consequencescutting behavior and suicide attempts. The abstract diagnoses themselves do not by any stretch of the imagination constitute grounds for terminating a person's parental rights. We will not terminate parental rights based solely on a diagnosis of mental illness. State ex rel. SOSCF v. Hammons, 170 Or.App. 287, 298-99, 12 P.3d 983 (2000), rev. den., 331 Or. 583, 19 P.3d 356 (2001). As quoted by the majority, the symptoms of mother's conditions are "impulsivity, poor decision making, an inability to regulate emotions and affect, and particularly anger, substantial difficulty in relationships, volatility in relationships, suicidal gestures and acting out, self-harm behavior, and chronic feelings of emptiness, serious negative response to any perceived rejection or abandonment," as well as "feelings of hopelessness, worthlessness." 229 Or.App. at 622-23, 214 P.3d at 3-4. A person with those symptoms, we can all agree, will probably not be an ideal parent. But I would wager that most people have at least a few acquaintances who fit the description and who have nonetheless raised exemplary, happy, thriving, and successful children. I know that I do.
Thus, it is what mother has done, not the label the psychologists use to characterize her, that matters. By that measure, the state has not met its burden. I am not persuaded that the record presents clear and convincing evidence that mother has displayed a "[l]ack of effort * * * to adjust the circumstances of the parent, conduct, or conditions to make it possible for the child * * * to safely return home within a reasonable time," or that mother has failed "to effect a lasting adjustment." ORS 419B.504(5). Nor am I persuaded, as the trial court concluded, that the record presents clear and convincing evidence that mother has shown a "[l]ack of effort or failure to obtain and maintain a suitable or stable living situation" for L or failed "to present a viable plan for the return of [L]" to mother's care. Mother enrolled in parenting classes, attended DBT therapy, and, at least for the first year, regularly attended visits with her children, as required by her service agreement with DHS. Although mother did not always maintain stable housing, at the time of trial she had obtained housing where L could live with her. After the court approved changing the plan for L to adoption, mother began to cancel visits with L, failed to attend additional parenting classes, and revoked releases allowing her caseworker to talk with her therapist, factors that weigh in favor of the trial court's conclusion. However, given that mother reenrolled in parenting classes, and given the evidence that at least some of the deterioration in communication had to do with mother's therapist's distrust of mother's caseworker, I am reluctant to give this factor conclusive weight.
Further, although mother did engage in some criminal conduct, two instances of shoplifting and one instance of improperly using a disabled parking permit do not rise to the level of "[c]riminal conduct that impairs the parent's ability to provide adequate care for the child or ward." ORS 419B.504(6). To *20 the contrary, there is no evidence that any such instance of criminal conduct involved or affected L or interfered with mother's ability to parent L. See Stillman, 333 Or. at 147, 36 P.3d 490 ("Criminal conduct that meets [the requirements of ORS 419B.504(6)] could include such conduct as abetting the child's own criminal conduct, stealing the child's property, or soliciting the child to commit a crime."); State ex rel. SOSCF v. Freeman, 174 Or.App. 194, 206, 23 P.3d 1009, rev. den., 332 Or. 430, 30 P.3d 1183 (2001) (concluding that, although incarceration alone is not sufficient, "a recurring pattern of criminal conduct and incarceration," in combination with other factors weighing against fitness, can justify termination of parental rights).
It is undisputed, however, that mother's conduct, in particular her cutting and her suicide attempts, are legitimate grounds for profound concern.[2] That concern, however, relates to the effect of that conduct on L, and, in the words of the statute, whether mother's conduct and condition are "seriously detrimental" to L.

B. Serious detriment to L

The Supreme Court has explained that
"the focus of * * * the test for termination * * * is on the detrimental effect of the parent's conduct or condition on the child, not just the seriousness of the parent's conduct or condition in the abstract. Thus, the court first must identify the parent's conduct or condition, and then measure the degree to which that conduct or condition has had a seriously detrimental effect on the child."
Stillman, 333 Or. at 146, 36 P.3d 490. We will not terminate parental rights "merely because of an inability to maximize the child's potential." State ex rel Dept. of Human Services v. Squiers, 203 Or.App. 774, 793, 126 P.3d 758 (2006). Instead, in requiring that the parent's conduct or condition be seriously detrimental to the child, "[t]he legislature had in mind conduct substantially departing from the norm * * *." State v. McMaster, 259 Or. 291, 303, 486 P.2d 567 (1971).
Thus, for example, in State ex rel. SOSCF v. Lehtonen, 172 Or.App. 584, 590-91, 20 P.3d 210, rev. den., 333 Or. 73, 36 P.3d 974 (2001), the child suffered from a reactive attachment disorder and behavior difficulties, including tantrums and bedwetting, that increased around the time of visitations with the mother. Those facts, combined with the mother's history of placing the child in high-risk circumstances when she consumed alcohol so excessively that she was unable to care for him, established that the mother's conduct had caused serious detriment to the child. Similarly, in State ex rel. DHS v. Payne, 192 Or.App. 470, 483, 86 P.3d 87, rev. den., 337 Or. 160, 94 P.3d 876 (2004), the child "showed hyperactivity, aggression, and unsafe behavior. He was diagnosed with post-traumatic stress disorder, attention deficit disorder, and `attachment issues.' After a period of isolation from [his] mother, * * * he showed marked improvement." Those behavioral problems were enough to establish that the mother's conduct had caused serious detriment to the child.
In the present case, in contrast, the state has not proved that mother's conduct caused serious detriment to L. First, L demonstrates no serious psychological or behavioral issues attributable to mother's conduct or condition. Crutchfield reported that L was "anxious," and that the anxiety stemmed from confusion about the relationship between her biological mother and her foster mother. The fact that a foster child has such anxiety is hardly remarkable. In fact, Eastman concluded that L "is generally affectionate, social, and well adjusted and happy" and that L "generally does not have any emotional or behavioral issues. She is very social around other children. She has not had any behavioral difficulties."[3] In view of that assessment, *21 Eastman's testimony that L's play reflected safety concerns is not enough to prove that mother's conduct or condition was severely detrimental to L. Indeed, it is difficult for me to believe that the state, the trial court, or the majority can seriously consider an isolated, brief play episode as even minimally relevant to the question of whether the state should take L away from her mother, especially when that episode is reported by a psychologist who had only the briefest contact with L and who had been pre-briefed by the state, after the state had decided to terminate mother's parental rights, about mother's psychological issues.
Beyond L's anxiety about having "two mommies" and her doll play, the state's evidence of serious detriment consists of speculation about the future, mostly based on the psychologists' general observations of what tends to happen to the children of borderline or depressed parents. I recognize that the requirement that mother's condition or conduct be seriously detrimental to L does not mean "that the serious detriment must already have occurred as a prerequisite to termination." Payne, 192 Or.App. at 483, 86 P.3d 87. I also understand that "[a] condition or conduct can be called `detrimental' based on potential harm even before that harm comes to pass." Id. In the present case, I recognize that the psychologists have grave concerns about L; Eastman expressed concern that L might "begin integrating borderline personality disorder dynamics as her way of coping with emotions." But grave concerns are not clear and convincing evidence. Given the absence of evidence that mother exposed L to suicide attempts or cutting behavior in the past, and even if we were to credit the theory that borderline personality disorders may be passed from generation to generation by proximity, future serious detriment is far too speculative to justify terminating mother's parental rights. As we recently held, "The indeterminate `risk' that [the child] will develop [a psychological] disorder is not, in the totality of the circumstances, sufficient to warrant termination under ORS 419B.504." State ex rel Dept. of Human Services v. R.T., 228 Or. App. 645, 657, 209 P.3d 390 (2009).
Nor does the record establish that mother's mental illness is so severe "that her ability to safely parent a child on a sustained basis [is] impaired." State ex rel. Dept. of Human Services v. J.A.C., 216 Or.App. 268, 279, 172 P.3d 295 (2007). Instead, the evidence shows that, when mother's mental health deteriorated, she took steps to keep L safe. For example, mother made appropriate plans for L prior to her hospitalizations, and she testified that she never engaged in cutting behavior in L's presence. Dykstra's testimony that mother "fell within the mild to medium range" of borderline personality disorder and "does not have that damage to others component" common to that diagnosis bolsters my conclusion. Although it may be true, as the state argues, that the atmosphere in mother's house was "chaotic" and that her moods were "unpredictable," "seriously detrimental" means more than the inability "to furnish surroundings which would enable the child to grow up as we would desire all children to do." McMaster, 259 Or. at 303, 486 P.2d 567. I am not persuaded that mother's mental illness is so severe that it prevents her from safely parenting L.
In short, the state has shown that L has anxiety, that her doll play shows concern for others' safety, and that she may grow up to have even more anxiety and, although she is happy now, depression. The state has also shown that mother has engaged in some deplorable and regrettable conduct. The question is whether we can take people's children away from them under those circumstances. The answer is that we cannot.

III. CONCLUSION
Mother's condition and conduct are cause for serious concern, and continued vigilance will be necessary because of the possibility that they could become seriously detrimental to L if they do not continue to improve. But based on the extensive record before us, I believe that the situation here resembles the *22 one described in State ex rel Dept. of Human Services v. Huston, 203 Or.App. 640, 660, 126 P.3d 710 (2006) (Brewer, C. J., concurring):
"[P]arents with entrenched multiple diagnoses and problems have become the norm in termination of parental rights cases. Such parents, like mother in this case, generally present with both mental or emotional issues and substance abuse problems. To expect parents to resolve within a few months serious, layered, and complex psychological issues that often have taken a lifetime to develop simply is not realistic. On the other hand, the agency is charged with protecting society's most precious resource, the safety and well-being of a child, and it cannot be expected to wait indefinitely, pouring finite resources into a parent-child relationship that has little chance of resumption within a reasonable period of time. In circumstances such as these, the agency can expect to be criticized for acting either too precipitously or too slowly regardless of the permanency plan that it pursues. So, what to do?
"In a case like this, the key for me is the health and condition of the child. If the child has few if any special needs and is psychologically healthy, as is undisputedly the situation here, it is better to err on the side of giving a parent who is making progress toward addressing multiple deficiencies a more comprehensive opportunity to remediate them than would otherwise be the case."
Because I reach this conclusion, I would not address whether integration into mother's home is "improbable within a reasonable time," ORS 419B.504, or whether termination of mother's parental rights is in L's best interest.
I dissent.
NOTES
[1] Although the dissent suggests to the contrary, 229 Or.App. at 43-44, 214 P.3d at 13-14 at (Schuman, J., dissenting), DHS was unaware of her mental health history when mother adopted L, and some of mother's statements regarding her background and family history in her application to adopt L were inconsistent with her later reports.
[2] In May 2007, mother had another drug and alcohol evaluation. The evaluator found that outpatient treatment would be appropriate but that mother "may have adequate support at this time." The evaluator was "willing to defer to [mother's] wishes" for other treatment.
[3] Online exercises are not a typical part of a DBT program. Gantt explained that, in a DBT program, a client goes to group sessions to learn new skills, does individual therapy to apply those skills to particular problems, does homework, and practices meditation exercises.
[4] Mother was required to leave after about eight months' residency because she failed to pay rent one month, had consistently paid rent late, had two unauthorized residents in her apartment, and had a kitchen fire. The apartment was so infested with fleas on her departure that it had to be flea-bombed several times before staff could clean it.
[5] On two occasions, Vang observed that mother became offended and told L that mother is the mommy. L started crying the second time it happened. Lewis also observed an incident in which L became upset when mother told L that L's foster parents were not her parents.
[6] Eastman explained that children L's age generally cannot be interviewed directly about emotional issues and that symbolic play is a method for identifying such issues. Eastman found L to be "very capable of using symbolic play." Although the dissent is critical of symbolic play, 229 Or.App. at 650-51, 214 P.3d at 17 (Schuman, J., dissenting), we find Eastman's explanation of the evaluation to be clear and persuasive.
[7] State ex rel Dept. of Human Services v. R.T., 228 Or.App. 645, 209 P.3d 390 (2009), is not to the contrary. There, the issue was whether reintegration of the child into his parents' home was improbable within a reasonable time. Id. at 656, 209 P.3d 390. We concluded that the state had not met its burden on that issue. The parents had made substantial efforts and needed a few months to demonstrate whether they could address issues in their relationship and meet the child's needs. The child had been diagnosed with some minor developmental issues, and a licensed clinical social worker opined that the child was at some risk of developing reactive detachment disorder. Id. at 656-57, 209 P.3d 390. We found that evidence of an indeterminate risk unpersuasive where the social worker formed her opinion that the child lacked any secure attachment by observing the child with his parents and potential adoptive parents only a couple of months after the child moved to the potential adoptive home from a foster home where he had lived for 20 months, since he was an infant. Id. at 647-48, 209 P.3d 390. Although the social worker believed that the child would likely attach to his potential adoptive family if he had been attached to his earlier foster family, she had little information about whether the child had formed such attachments. Id. at 656, 209 P.3d 390.

Here, by contrast, we are assessing whether mother's conduct is seriously detrimental to L. Eastman identified specific, unusual concerns raised by L's symbolic play, reviewed background materials, observed L individually and with mother, and interviewed mother and L's foster mother. Her opinion does not suffer from the information gaps present in R.T., and she identified significant risks to L. Moreover, unlike the parents in R.T., who were making progress, mother here engaged in suicide attempts and required the assistance of emergency responders shortly before trial; although mother may have made some limited progress, she still lacks control over her suicide-related behavior.
[1] Mother stipulated to termination of her parental rights as to R. At the time of trial, E was living with her father and was not involved in this proceeding.
[2] I do not regard instances of "suicidal ideation," without more, to be of any significance.
[3] Although L's lack of emotional or behavioral issues may be due at least in part to Kathy and Michael's care, the issue before us is not whether L would be better off if she remained in their care, but whether the state has established a serious detriment to L. See Simmons, 342 Or. at 102 n. 12, 149 P.3d 1124 (although "the fact that [the] child has done as well as she has is due largely to the excellent care that she has received in the home of her foster parents, * * * the issue before us is not whether [the] child would be better off if she remained with [her foster parents, but] * * * whether the state has shown by clear and convincing evidence that [the] mother is unfit because her conduct or condition was seriously detrimental to [the] child").